FILED BY ___ D.C.

97 FEB -5 PM 12:53

CARLOS JUENKE
CLERK U.S. DIST. CT.
S.D. OF FLA.-MIAMI.

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION

CASE NO. **97-8074**
**CIV-HURLEY**
MAGISTRATE JUDGE
LYNCH

SHELL OIL COMPANY,

Plaintiff,

vs.

PASQUALE PERROTTA,

Defendant.
_______________________________/

**COMPLAINT FOR DECLARATORY JUDGMENT, INJUNCTIVE RELIEF, AND DAMAGES**

Shell Oil Company ("Shell"), Plaintiff, by its undersigned attorneys, sues Defendant, Pasquale Perrotta ("Perrotta"), for injunctive and declaratory relief and damages and alleges as follows.

## JURISDICTION AND VENUE

1. Shell is a corporation incorporated under the laws of the State of Delaware with its principal place of business in Houston, Texas.

2. Defendant, Perrotta, is a resident of Florida and is engaged in the business of selling motor fuel and other petroleum products under Shell's trademarks, brand names, service marks, or other Shell identifications at the station premises located at 20642 State Road 7, Boca Raton, Florida.

3. This action is one over which this Court has original jurisdiction under 28 U.S.C. §1331 arising under the laws of the United States of America, specifically the provisions of the Petroleum Marketing Practices Act ("PMPA"), 15 U.S.C. § 2801, et seq., and is based upon

a controversy between parties to a petroleum marketing franchise without regard to amount in controversy.

4. Additionally, this action is one over which this Court has original jurisdiction under 28 U.S.C. §1332, in that:

a. Diversity of citizenship exists between the parties.

b. The matter in controversy exceeds $75,000.00, exclusive of interest and costs.

5. This Court also has supplemental jurisdiction under 28 U.S.C. § 1367 over all other claims arising out of the same case or controversy.

6. Venue is proper in this District pursuant to 28 U.S.C. §1391(a), in that:

a. Defendant is a resident of Florida; and

b. A substantial part of the events giving rise to this action occurred in this District.

**THE FRANCHISE AGREEMENT**

7. Perrotta leases and operates a service station located at 20642 State Road 7, Boca Raton, Florida (the "Service Station"). Shell owns the Service Station, all improvements, equipment and fixtures contained on the site, and holds the ground lease upon which the Service Station is located. Shell leases the Service Station, including the improvements, equipment and fixtures, to Perrotta, Shell's Dealer. This Complaint relates to the parties' respective rights, duties and obligations with respect to the lease and operation of the Service Station.

8. On or about November 1, 1994, Shell and Perrotta entered into a petroleum marketing franchise and petroleum marketing franchise relationship, as defined by the Petroleum Marketing Practices Act, 15 U.S.C. § 2801, et seq., (hereinafter "PMPA"), through two written

agreements entitled "Motor Fuel Station Lease", ("Lease"), and "Dealer Agreement". Copies of the Lease and Dealer Agreement are attached hereto as Exhibit 1 and Exhibit 2 respectively and are incorporated by reference herein.

9. The Lease covers the Dealer's lease of the Service Station from Shell. The Dealer Agreement covers Shell's sale and the Dealer's purchase of certain Shell products in connection with Dealer's operation of the Service Station. Both agreements have a term beginning November 1, 1994 and ending October 31, 1999.

10. By virtue of the Lease and Dealer Agreement, Shell granted Perrotta the right to use Shell's trademarks, brand names, service marks or other Shell identifications in connection with the sale of motor fuel and other petroleum products at a gasoline service station located at 20642 State Road 7, Boca Raton, Florida, (hereinafter the "Station Premises"). By virtue of the Lease Perrotta was permitted to occupy the Station Premises.

**THE DISPUTE BETWEEN THE PARTIES**

11. In late 1994 and early 1995, Perrotta erected a hand wash and wax facility at the Premises in order to conduct car wash operations. Perrotta did not seek Shell's prior approval to erect the car wash as required under Article 5.6 of the Lease. Perrotta also did not secure any required permits to operate the car wash facility and failed to comply with Palm Beach County Ordinance 92-90 relating to zoning of properties in the county. The Palm Beach County Code Enforcement Board issued a violation notice to Shell's landlord, which in turn sent Shell a lease violation letter. At that time, Shell informed Perrotta that his actions violated applicable laws as well as Shell's underlying lease, and Perrotta removed the facility.

12. At some time in September 1996, Perrotta once again erected a hand wash and wax facility, once again without obtaining Shell's permission or proper permits, and once again in violation of local law.

13. After Perrotta again committed this franchise violation in September 1996, Shell sent three separate letters to Perrotta's attorney to secure Perrotta's removal of the hand wash facility. Perrotta ignored each one of the letters, failed to timely comply with Shell's requests, and refused to remove the hand wash facility.

14. Perrotta's conduct breached the provisions of the Motor Fuel Station Lease and Dealer Agreement and constitutes grounds for termination under the franchise contracts and under the provisions of the PMPA.

15. By letter dated November 26, 1996, certified mail, return receipt requested, Shell notified Perrotta of the termination of the franchise and franchise relationship between the parties on the grounds that Perrotta failed to comply with the provisions of the Dealer Agreement and Motor Fuel Station Lease, and for grounds stated with the PMPA. Perrotta also received a summary of Title I of the PMPA. A true and correct copy of this letter (the "Termination Letter") and summary is attached as Exhibit "3". Pursuant to this termination letter, Perrotta's Lease and Dealer Agreement are terminated effective March 6, 1997.

16. Unperturbed by the termination of his lease, on or about December 20, 1996, Perrotta dug trenches and installed electrical wiring for the operation of vending machines at the south side of the fueling island kiosk. Perrotta did not seek, nor did he obtain, Shell's consent as required under the Lease. Perrotta also failed to obtain necessary permits from the county.

17. Perrotta's conduct violates Article 5.6 of the Lease. Also, by digging trenches around the fueling island, Perrotta may have affected the product piping system.

18. On January 16, 1997, Shell sent Perrotta, through counsel, a letter demanding that Perrotta stop the installation of the vending machines. Perrotta did not comply with Shell's request.

19. Perrotta's continuing violations do not end with violating local laws and altering Shell's service station. Perrotta has also interfered with Shell's ability to improve and maintain the service station.

20. In August of 1996, Shell began construction of a car wash building at the station and began adding other improvements (collectively, the "construction project"). Shell has invested over $300,000 in significant improvements to the property. Perrotta, for his part, agreed to purchase and install the car wash equipment once the building was completed. Perrotta, however, has refused to purchase the equipment and instead erected the illegal hand car wash facility.

21. On or about January 17, 1997, B & M Construction, an authorized Shell contractor, was at the service station meeting with county inspectors over the construction project. Perrotta called local police to the service station to have Shell's contractor removed.

22. On or about January 21, 1997, Shell sent Magnum Tank Service, another authorized Shell contractor, to the station to inspect and alleviate a drainage problem. Perrotta refused entry on to the premises and thereby prevented Magnum from performing any repair or maintenance work.

23. On or about January 28, 1997, Perrotta refused entry on to the premises to Shell's managers and Shell's contractors who were at the service station to supervise and perform repair and maintenance work.

24. Perrotta is obstructing Shell's ownership rights and improperly denying Shell its rights to enter the premises under Articles 5.5 and 6.1 of the Lease, Article 12 of the Dealer Agreement, and the PMPA. Perrotta's conduct is jeopardizing Shell's equipment and investment in its property, has put Shell's own ground lease at risk, and is in breach of the Lease, Dealer Agreement, and the PMPA.

**COUNT I**

**INJUNCTIVE RELIEF FOR ENTRY ON THE PREMISES**

25. Shell incorporates the allegations contained in paragraphs 1 through 24 of the Complaint by reference as if fully set forth herein.

26. As Perrotta's landlord and as the owner of the Service Station, under Articles 5.5 and 6.1 of the Lease, and Article 12 of the Dealer Agreement, Shell is entitled to enter the premises at any time to inspect its equipment, perform repair and maintenance, and make alterations.

27. In addition, Shell is in the midst of a significant construction improvement project at the Service Station which includes the construction of a car wash building and surrounding landscaping.

28. Perrotta has refused Shell's authorized contractors entry on the premises to perform construction work, inspections and maintenance and repair.

29. Unless Perrotta is required to immediately cease and desist from obstructing Shell's entry on the premises and is required to allow Shell entry as provided under the Lease and Dealer Agreement, Shell will suffer substantial irreparable injury.

30. By reason of the foregoing, Shell is entitled to the following injunctive relief:

a. An injunction prohibiting Perrotta, his employees, agents, servants, attorneys, and those persons or entitles in active concert or participation with him, from refusing or otherwise obstructing Shell's reasonable entry on the premises of its station to carry out activities including but not limited to completing the construction project and inspecting and maintaining Shell's equipment; and

b. any other relief deemed appropriate by the Court.

WHEREFORE, the Plaintiff prays that this Honorable Court:

A. Enters injunctive relief as described herein;

B. award Plaintiff its reasonable attorneys' fees incurred in this matter; and

C. Award such other and further relief as the nature of the cause may require.

**COUNT II**

**DECLARATORY RELIEF**

31. Shell incorporates the allegations contained in paragraphs 1 through 24 of the Complaint by reference as if fully set forth herein.

32. Perrotta has expressly indicated and threatened that he will not voluntarily vacate the service station premises when the Lease and Dealer Agreement terminate on March 6, 1997.

33. By reason of the refusal and failure of Perrotta to recognize the termination of the franchise and franchise relationship and to vacate or surrender the service station premises as

described above, an actual controversy exists between the parties, and if Perrotta does not recognize the termination of the franchise and franchise relationship, and vacate and surrender the service station premises, Shell will be damaged.

34. Pursuant to the provisions of the PMPA, 28 U.S.C. §2201, et seq., Shell requests that this Court declare the respective rights of the parties with regard to the subject matter contained herein. More specifically, Shell requests that this Court declare:

a. that Perrotta is in breach of the Lease and Dealer Agreement;

b. that Perrotta's breach of the Lease and Dealer Agreement as described above constitutes grounds for termination of the Dealer Agreement under 15 U.S.C. §2802(b)(2)(A);

b. that Perrotta's breach of the Lease and Dealer Agreement as described above constitutes grounds for termination of the Dealer Agreement under 15 U.S.C. §2802(b)(2)(C);

c. that Shell gave proper notification of the termination of the franchise and franchise relationship and the Lease and Dealer Agreement pursuant to the PMPA;

d. that termination of the franchise and franchise relationship and the Lease and Dealer Agreement between Shell and Perrotta is justified and in accordance with the PMPA;

e. That the subject Service Station premises are to revert back to the possession, custody and control of Shell on the effective date of termination, or as soon thereafter as the Court may rule; and

f. That Shell is entitled to other and further declaratory relief declaring the rights and liabilities between the parties under the circumstances.

WHEREFORE, the Plaintiff prays that this Honorable Court:

A. Declare the respective rights of the parties as described herein;

B. Award Plaintiff its reasonable attorneys fees incurred in this matter; and

C. Award such other and further relief as the nature of its cause may require.

## COUNT III

## BREACH OF FRANCHISE

35. Shell incorporates the allegations contained in paragraphs 1 through 24 of the Complaint by reference as if fully set forth herein.

36. Shell has suffered substantial damages due to Perrotta's breach of the Lease and Dealer Agreement. Shell is entitled to compensation for these damages, including damages for loss of good will.

WHEREFORE, the Plaintiff prays that this Honorable Court:

A. Award Plaintiff damages in an amount to be determined;

B. Award Plaintiff its reasonable attorneys' fees incurred in this matter; and

C. Award such other and further relief as the nature of its cause may require.

## THE RELIEF

WHEREFORE, Plaintiff, Shell Oil Company, as against Perrotta, respectfully requests the following relief:

(a) Pursuant to 38 U.S.C. § § 2201 and 2202 declaring that (i) Perrotta has breached the provisions of the Motor Fuel Station Lease and Dealer Agreement; (ii) Perrotta has failed to comply with relevant zoning laws and regulations; (iii) there was proper notification of the termination of the franchise and franchise relationship between the parties pursuant to the PMPA; (iv) termination of the franchise and franchise relationship between the parties is justified and in accordance with the PMPA; (v) the subject service station premises are to revert back to

the possession, custody and control of Shell; (vi) for such other and further declaratory relief concerning the rights and liabilities between the parties under the circumstances;

(b) An injunction compelling Perrotta to cease and desist from interfering with Shell's right to enter onto the premises of the Service Station to perform maintenance, repair, and other operations as permitted or required under the agreements and applicable law;

(c) Damages in an amount to be determined at trial;

(d) Attorney's fees;

(e) Interest, costs and disbursements incurred in this action;

(f) Such other and further relief as is just and reasonable under the circumstances.

Dated: February 5, 1997

Respectfully submitted,

HOLLAND & KNIGHT LLP
Attorneys for Shell Oil Company
701 Brickell Avenue
P.O. Box 015441
Miami, Florida 33101
(305) 374-8500

By: ______________________
William E. Hamilton
Florida Bar No. 379875
Samuel A. Danon
Florida Bar No. 892671
D. Bruce Hoffman
Florida Bar No. 958026

Of Counsel:

George A. Nachtigall
Senior Counsel
Shell Oil Company
4812 One Shell Plaza
Houston, Texas 77252-2463
(713) 241-5505

MIA3-466252

A



Station Location: 20642 SR 7
BOCA RATON, FL 33434
Dealer WIC # 20908550724

MOTOR FUEL STATION LEASE

THIS IS A LEASE effective November 1, 1994 between SHELL OIL COMPANY, Hillsboro Center, 600 West Hillsboro Blvd., Suite 250, Deerfield Beach, FL 33441 ("Shell") and PASQUALE PERROTTA, doing business as SHADOWWOOD PLAZA SHELL, 3163 NE 8TH AVE., BOCA RATON, FL 33434 ("Lessee").

PART I of this Lease sets forth the particular provisions of this Lease and includes the executions of this Lease by Shell and Lessee and any Special Provisions that may be applicable, and PART II sets forth the general provisions of this Lease and includes Exhibit A relating to Lessee's maintenance obligations and any Supplements to this Lease which may be referred to in PART I or any such Special Provisions. The provisions of Exhibit A and any such Special Provisions and Supplements shall control to the extent of any conflict between such provisions and the body of this Lease. The numbers in the left column in PART I relate to applicable articles in PART II.

PART I

Article No.

1(h) Leased Premises located at: 20642 SR 7, BOCA RATON, FL 33434.

3. Term of Lease begins on the effective date specified above and ends on October 31, 1999.

4.1 Premises rent:

| Period | | | Monthly Rent |
|---|---|---|---|
| From November 1, 1994 | through | October 31, 1995 | $6867 |
| From November 1, 1995 | through | October 31, 1996 | $7553 |
| From November 1, 1996 | through | October 31, 1997 | $7931 |
| From November 1, 1997 | through | October 31, 1998 | $8327 |
| From November 1, 1998 | through | October 31, 1999 | $8744 |

SEE Amendment
PP

5.2 Specified hours of operation: 24 hours each day.

8(d) Minimum fire legal liability insurance: $ 125,000.

11.1 Special conditions/restrictions affecting underlying lease: SEE ATTACHED SUPPLEMENT

11.2 Notice to Lessee: Underlying lease will expire or is otherwise subject to termination on September 30, 1997.

PP

MKT100.0/R1193
19940427

**SPECIAL PROVISIONS:**

— Diesel Facilities. Lessee shall pay Shell monthly the sum shown below as an additional rent for diesel storage and dispensing facilities and related signage ("Diesel Facilities") provided by Shell to Dealer under this Lease. The provisions of this Lease shall apply to the Diesel Facilities and the payment of such additional rent except as provided herein. Shell may convert the Diesel Facilities to gasoline use at any time on 60 days' notice to Lessee, in which event the foregoing separate rent shall cease and the Premises monthly rent specified in item 4.1 above shall be appropriately increased. The foregoing additional rent for the Diesel Facilities shall not be subject to any program that may be made available by Shell from time to time whereby Lessee may earn a credit against rent specified in this Lease through the purchase of gasoline.

Additional Diesel Facilities monthly rent: $200.

NOTE TO LESSEE: BE SURE YOU READ AND UNDERSTAND ALL PROVISIONS OF THIS BINDING DOCUMENT BEFORE YOU SIGN, INCLUDING PAGES WHICH FOLLOW.

EXECUTED on the date(s) shown below.

PASQUALE PERROTTA
d/b/a SHADOWWOOD PLAZA SHELL

P. Perrotta

Date: 6-9-94

SHELL OIL COMPANY

By M. Pellino
J. M. PELLINO
AREA/TERRITORY MANAGER

Date: 6-9-94



MKT100.0/R1193
19940427

PART II

**DEFINITIONS**

1. As used in this Lease, whether in the singular or plural:

(a) alteration shall mean any addition or change to, or modification, removal or replacement of, any building, improvement or equipment on the Premises;

(b) business entity shall mean any legal entity which is not an individual, including, without limitation, a partnership, corporation, trust, estate or association;

(c) expiration shall mean the coming to an end of the term provided in article 3, or any extension thereof provided in article 14 or otherwise agreed to in writing by Shell and Lessee;

(d) law shall mean any applicable statute, constitution, ordinance, regulation, rule, administrative order or other requirement of any federal, state or local government agency or authority, which, unless otherwise specified herein, is in effect either at the time of the execution of this Lease or any other time during the term;

(e) maintenance or maintain shall mean, unless the context otherwise indicates, preventive maintenance, repairs, replacement, repainting and cleaning;

(f) nonrenewal shall mean a failure by Shell to continue or extend this Lease at the conclusion of the term provided in article 3, or of any extension thereof provided in article 14 or otherwise agreed to in writing by Shell and Lessee;

(g) PMPA shall mean the Petroleum Marketing Practices Act (15 U.S.C. • 2801 et seq.);

(h) Premises shall mean collectively: the land owned or leased by Shell at the location identified in PART I, to the extent improved by Shell or with Shell's written consent for use as a motor fuel dispensing station and for associated purposes, and the buildings, improvements and equipment now or hereafter located on the land; and

(i) termination shall mean the ending of the term for any reason before expiration, as defined herein.

**LEASE**

2. Shell hereby leases to Lessee, and Lessee hereby leases from Shell, the Premises. Subject to article 6.2, Lessee acknowledges that the Premises are in good and safe condition and repair. Upon any termination or expiration of this Lease, Lessee shall peaceably surrender possession of the Premises to Shell in as good order and condition as when delivered to Lessee, excepting ordinary wear and tear, acts of God and maintenance for which Shell is responsible.

**TERM—TERMINATION**

3. This Lease shall be binding from execution and shall be in effect for the term set forth in PART I, unless extended pursuant to article 14 or otherwise by written agreement, but may be terminated by Lessee at any time by giving Shell at least 90 days' notice, or may be terminated by Shell as provided in the succeeding articles hereof.

**RENT**

4.1 General. Lessee shall pay Shell as rent for each calendar month, without deduction, set off, notice or demand, the sum specified in the schedule set forth in PART I, in advance not later than the first day of such month, except that rent due on a weekend or federal holiday will be payable on the business day next following the due date. Rent for any period less than a calendar month shall be prorated. In addition to the rent specified above, Lessee shall pay or reimburse Shell for, in accordance with law, all taxes which may be imposed on the rental of any real or tangible personal property included under this Lease, including any such taxes imposed for any prior periods in which Lessee leased the Premises from Shell. For the purpose of determining any such taxes due, Shell shall have the option at any appropriate time of identifying the tangible personal property included under this Lease and allocating thereto a portion of the rental hereunder.

4.2 Payment. Rent shall be deemed paid when received by Shell at its address provided by Shell to Lessee from time to time. Shell may at its option from time to time prescribe that rent be paid when due by draft or electronic funds transfer initiated by Shell, and Lessee shall provide any written authorizations required for such purpose.

USE

5.1 General. The Premises shall be used for operation of the motor fuel dispensing station and associated facilities existing on the effective date of this Lease or thereafter completed or installed by Shell or with Shell's written consent. Authorized use shall include the retail sale of petroleum products and carry–out automotive accessories, but excludes any automotive repairs or services except such incidental services as are normally provided to vehicles receiving motor fuel while at the motor fuel dispensing driveway area (such as checking oil and coolant levels and cleaning windshields). Authorized use shall also include the operation of any convenience store, food mart, car wash or other non–gasoline facility on the Premises according to standards established by Shell for such facility. Except with the prior written consent of Shell, which may be withheld consistent with applicable law, Lessee may not use underground tanks, associated product lines or motor fuel dispensing equipment provided by Shell in the sale or dispensing of non–Shell motor fuel. Lessee's installation and use of any additional tanks and associated equipment for the purpose of selling non–Shell motor fuel shall be subject to article 5.6 and all other applicable provisions of this Lease and any related agreements between Shell and Lessee. If, with Shell's prior written consent, the Premises are used for any purpose in addition to the use provided for in this Lease and any related agreements between Shell and Lessee, Shell may charge a reasonable additional rent as compensation for such use.

5.2 Lessee's Efforts—Hours. Lessee shall devote Lessee's best efforts to preserve the value of the Premises for the foregoing authorized use by serving effectively the public's and consumers' needs, and to assure that end, shall keep the station open for the sale of motor fuel and fully illuminated during the hours and days set forth in PART I. Such hours of operation shall be subject to adjustment if and as required by law. Lessee shall personally and actively manage the business conducted at the Premises to assure good faith compliance with this article 5.2 and other provisions of this Lease.

5.3 Use Prevented by Law. Either Shell or Lessee terminate this Lease on giving the other notice (or advance notice if and as required by law) if at any time any law shall operate or be enforced so as to prevent the continued use or occupancy of the Premises (either directly or by requiring specified alterations at a cost which is disproportionate to the value of the Premises for such continued use or occupancy) for the purpose for which such Premises were being used immediately prior to the effectiveness, application or enforcement of such law, as the case may be.

5.4 Business Charges—Lawful Operations. Lessee shall satisfy all regulatory requirements and timely pay all charges incident to the ownership, possession or use of the Premises, the business conducted thereon, or the protection of the environment pertaining thereto, including all federal, state and local taxes, levies, assessments and charges (except ad valorem taxes on Shell's property and taxes based upon the net income of Shell); all license, registration, permit, occupation and inspection taxes and fees; all water, sewer, waste disposal, gas, electricity, telephone and other utility charges; and all taxes on Lessee's property on the Premises. Without limitation of the foregoing, Lessee shall comply with all laws, licenses and permits relating to the Premises or any use thereof or to any act or activity on the Premises, including, without limitation, any special zoning or other governmental restrictions specified in PART I and any such laws, licenses or permits pertaining to environmental protection. All licenses, permits and accounts required for the foregoing shall be in Lessee's name unless Shell, in its discretion, directs otherwise. If Shell at any time satisfies any such regulatory requirements or bears any such charges, Lessee shall reimburse Shell upon demand for Shell's costs so incurred, without prejudice to any other rights or remedies available to Shell hereunder or by law. Lessee shall not (a) commit or permit any fraudulent or illegal act or activity or any consumption of intoxicating beverages or use of illegal drugs on the Premises, or (b) maintain or permit any animal or condition on the Premises which may endanger the health, safety or well–being of persons on the Premises.

5.5 Shell Alterations. Subject to the remaining provisions of this article 5.5, Shell shall have the right from time to time, without liability to Lessee, to make alterations to the Premises. Shell's right to make such alterations shall include, but not be limited to, modernization, reconstruction or remodeling of or adding to any buildings, equipment or other facilities on the Premises, and may involve the complete demolishing and rebuilding of any and all such facilities. If any such alteration will cause a substantial disruption or change in Lessee's business, Shell will provide Lessee with 90 days'

advance notice of the terms of its proposal to make the alteration, or such shorter notice as may be reasonable in any emergency situation, and during the period of such alteration work Shell shall reduce or suspend the rent payable hereunder as full compensation for the restrictions in use of the Premises resulting from such work. Shell shall exercise due diligence to complete all such alteration work in an expeditious manner, but Shell shall not be liable to Lessee for any loss of profit or other loss resulting from the conduct of the work or any completion delay except for an adjustment of rent as provided above. Upon completion of such alteration work, the rent hereunder will be appropriately adjusted if a change in the rental value of the Premises has resulted therefrom.

5.6 Lessee Alterations. Lessee shall not make any alterations to the Premises, including removal or disablement of leak detectors or other environmental control device, without Shell's prior written consent, which consent shall not be unreasonably withheld. Any such alteration to which Shell may give its consent shall be made in accordance with plans and specifications and by a contractor approved by Shell, which approval shall not be unreasonably withheld. Except as otherwise agreed in writing by Shell, at any termination or expiration of this Lease any alteration made by Lessee shall, at Shell's election, become a part of the Premises and the property of Shell or Shell may require Lessee within 30 days before or after termination or expiration to remove such alteration and restore the Premises to their condition existing prior to such alteration.

**MAINTENANCE**

6.1 General. Subject to the following provisions of this article 6, Lessee shall at all times maintain the Premises (including adjacent sidewalks and driveways, easements and all landscaped areas) and Lessee's own property and equipment thereon in good condition and repair, and keep the same neat, clean, safe and orderly. To those ends and always promptly as needed, Lessee shall perform the maintenance to Shell's property (or any of Lessee's property) which is specified in Exhibit A hereto, including any such maintenance as may be required by law unless Shell is expressly required by the same or other law to bear the cost thereof. Shell shall perform all other maintenance to Shell's property which Shell deems necessary or desirable (having due regard to the remaining term of this Lease and Shell's future plans for the Premises), provided that Lessee promptly gives Shell a written statement of each such maintenance which Lessee deems necessary. As to any maintenance specified in Exhibit A which Lessee fails to perform, or as to any such other maintenance concerning which Lessee fails to give Shell the above-required written statement, or which is necessitated, either partly or solely, by any negligent or otherwise wrongful act or omission of Lessee or Lessee's employees, agents or contractors: Shell may perform the same and charge to Lessee Shell's actual cost thereof, or in lieu of performing the same, may charge to Lessee what would have been the reasonable cost thereof. If the Premises are made substantially unfit for the intended use hereunder by any cause, either Shell or Lessee may terminate this Lease by giving the other notice (or advance notice if and as required by law) within 60 days after such unfitness commences. Shell may enter the Premises at any time for the purposes of inspecting the same (including the pump meters), gauging and testing tanks, performing maintenance and making alterations. The termination or expiration of this Lease shall not relieve Lessee of any obligation for maintenance theretofore accrued.

6.2 Initial Maintenance. Within 10 days after the effective date of this Lease, Lessee may provide Shell a written statement of any maintenance for which Shell or any previous lessee (other than Lessee herein or any third party through whom Lessee claims an interest hereunder) may be responsible, and the preceding provisions of this article 6 shall apply to such maintenance. Lessee shall be responsible for any maintenance required on such effective date regarding which Lessee fails to give Shell a written statement as above provided, and Shell shall be relieved of all responsibility therefor.

6.3 Dealer Inventory Control. To assure early detection of any leak in the underground motor fuel storage system at the Premises, Lessee shall maintain methodical daily inventory control, including daily reconciliation of physical inventory readings with sales records and delivery receipts, in accordance with Shell's procedures and applicable law. Lessee shall give Shell immediate telephone notification (promptly confirmed by written notice) of any suspected product loss, of any claim or threatened claim by a third party related to a product loss or alleged loss, or of any newly discovered material fact relating to any matter previously reported pursuant hereto. Without limitation of the foregoing, Lessee shall provide such notification to Shell of any inventory discrepancies for a single product (losses or gains) in excess of: (a) 300 gallons for a single day, (b) 150 gallons per day for three consecutive days (all losses or all gains) or (c) one-half of one percent (1/2 of 1%) of sales for any 30-day period. Shell, at its option from time to time, may require Lessee to provide Shell periodic written certifications that Lessee has complied with the foregoing provisions of this article 6.3. Lessee shall retain for a period of at least one year and

make available to Shell for inspection and audit, at all reasonable times, Lessee's records and procedures maintained pursuant to this article 6.3. If Lessee refuses or fails to perform in a proper and timely manner Lessee's obligations under this article 6.3, Shell may, at its option and without limitation of any other rights or remedies available to it under this Lease or otherwise, (a) retain the services of a qualified independent third party to inspect and audit Lessee's performance as frequently as necessary, at the sole cost of Lessee, until such deficiencies are cured or (b) terminate or not renew this Lease and any related agreements constituting a franchise between Shell and Lessee.

**INDEMNITY—REPORTS**

7. TO THE FULLEST EXTENT PERMITTED BY LAW (BUT NO FURTHER) AND WITHOUT IN ANY WAY LIMITING ANY OF LESSEE'S OBLIGATIONS UNDER ARTICLE 8 OF THIS LEASE, LESSEE SHALL DEFEND, INDEMNIFY AND HOLD HARMLESS SHELL, ITS PARENT, AFFILIATE AND SUBSIDIARY COMPANIES, AND THEIR RESPECTIVE DIRECTORS, EMPLOYEES AND AGENTS, AGAINST ALL CLAIMS, SUITS, LIABILITIES, JUDGMENTS, LOSSES AND EXPENSES (INCLUDING, WITHOUT LIMITATION, ATTORNEYS' FEES AND COSTS OF LITIGATION, WHETHER INCURRED FOR SHELL'S PRIMARY DEFENSE OR FOR SHELL'S ENFORCEMENT OF ITS INDEMNIFICATION RIGHTS HEREUNDER) AND ANY FINES, PENALTIES AND ASSESSMENTS, ARISING OUT OF ANY BODILY/PERSONAL INJURY, DISEASE OR DEATH OF ANY PERSONS OR DAMAGE TO OR LOSS OF ANY PROPERTY (EXCEPT SHELL PROPERTY TO THE EXTENT SHELL HAS RESPONSIBILITY THEREFOR UNDER ARTICLE 6), OR FOR LIENS ON THE PREMISES, CAUSED BY OR HAPPENING IN CONNECTION WITH THE PREMISES (INCLUDING ADJACENT SIDEWALKS AND DRIVEWAYS) OR THE CONDITION, MAINTENANCE, POSSESSION OR USE THEREOF OR THE OPERATIONS THEREON, EVEN THOUGH CAUSED BY THE CONCURRENT OR CONTRIBUTORY NEGLIGENCE OR FAULT OF A PARTY INDEMNIFIED; BUT EXCEPTING ANY SUCH INJURY, DISEASE, DEATH, DAMAGE OR LOSS CAUSED BY (A) THE SOLE NEGLIGENCE OR FAULT OF A PARTY OTHERWISE INDEMNIFIED OR (B) DEFECTS IN SHELL PRODUCTS NOT CAUSED OR CONTRIBUTED TO BY ANY NEGLIGENCE OR FAULT OF LESSEE OR LESSEE'S EMPLOYEES, AGENTS OR CONTRACTORS. WITHIN 24 HOURS AFTER ANY OCCURRENCE WHICH MAY RESULT IN SUCH INJURY, DISEASE, DEATH, DAMAGE OR LOSS, OR SUCH FINE, PENALTY OR ASSESSMENT, OR THE IMPOSITION OF SUCH LIEN, LESSEE SHALL REPORT THE SAME TO SHELL BY TELEPHONE AND SHALL PROMPTLY THEREAFTER CONFIRM THE SAME BY NOTICE, INCLUDING ALL CIRCUMSTANCES THEREOF KNOWN TO LESSEE OR LESSEE'S EMPLOYEES. SHELL SHALL HAVE THE RIGHT, BUT NOT THE DUTY, TO PARTICIPATE IN THE DEFENSE AND SETTLEMENT OF ANY SUCH CLAIM OR LITIGATION WITH ATTORNEYS OF SHELL'S SELECTION WITHOUT RELIEVING LESSEE OF ANY OBLIGATIONS HEREUNDER. LESSEE SHALL COOPERATE WITH SHELL IN SHELL'S INVESTIGATION AND DEFENSE OF ANY CLAIM OR SUIT. LESSEE'S OBLIGATIONS HEREUNDER SHALL SURVIVE ANY TERMINATION OR EXPIRATION OF THIS LEASE.

**INSURANCE**

8. Without in any way limiting any of Lessee's obligations, indemnities and liabilities under article 7 of this Lease or otherwise, Lessee shall maintain at all times, at Lessee's expense and in compliance with any applicable requirements of law, insurance satisfactory to Shell of the following minimum types and limits:

(a) Workers' Compensation Insurance with statutory limits, and Employers' Liability Insurance with limit of $100,000 each occurrence. Such insurance shall include a waiver of the insurer's rights of subrogation against Shell.

(b) Comprehensive General Liability Insurance (including, without limitation, coverage for premises/operations, operation of vehicles owned, non-owned or hired, products/completed operations, and contractual obligations assumed in article 7 hereof) with a combined limit for bodily/personal injury and property damage of $300,000 each occurrence. If Lessee sells or dispenses alcoholic beverages, such insurance shall include coverage for such activity with a minimum limit of $300,000 each occurrence. Such insurance shall name Shell and any lessor from whom Shell may lease the Premises as additional insureds.

(c) Environmental Impairment Liability Insurance covering off-site losses, which will be maintained during any period and with such minimum limit as shall reasonably be required by Shell, either initially from the effective date hereof or at any time thereafter, having due regard to the availability of such insurance during any such period. Except with respect to any initial requirement for such insurance which may be specified in PART I, Shell shall give Lessee at least 90 days' notice of any new or modified requirement for such insurance. Such insurance shall include Shell as a named insured.

(d) Fire Legal Liability Insurance on the leased building and any other property on the Premises leased or loaned by Shell to Lessee (whether under this Lease or otherwise), in the minimum amount set forth in PART I or in such modified amount as Shell may specify by notice to Lessee at any time based on alterations made after the effective date hereof.

Any insurance maintained by Lessee pursuant to this Lease shall be regarded as primary insurance underlying any other applicable insurance. Prior to the effective date of this Lease and thereafter prior to the expiration of any required insurance, Lessee shall provide Shell with evidence satisfactory to Shell showing that the insurances specified above are in effect and will not be cancelled or materially changed without at least 30 days' prior written notice to Shell. Lessee shall further provide Shell with at least 30 days' prior written notice if any such insurance shall expire for any reason without being replaced with equivalent coverage. Any insurance plan arranged by Shell and participated in by Lessee may provide for the periodic collection by Shell for the insurer of Lessee's premiums as payments due under this Lease.

**ASSIGNMENT— SUBLEASING— ENCUMBRANCE**

9.1 General. This Lease is personal to Lessee. Except as otherwise provided in this article 9 or by law, Lessee shall not assign or encumber any of Lessee's interest in this Lease or in the Premises, or sublease all or any part of the Premises, or permit any other arrangement having similar effect of such an assignment or sublease, or permit any other person to occupy or use all or any part of the Premises, either voluntarily, involuntarily or by operation of law, without Shell's prior written consent, which consent shall not be unreasonably withheld. Each request for Shell's consent to any assignment, encumbrance or sublease shall be submitted in the manner specified for notices in article 13.1, and Shell shall have 60 days (or any lesser period specified by law) following its receipt of all qualification information reasonably required by it in which to grant or withhold its consent in writing. No consent to any assignment, encumbrance or sublease shall constitute a waiver of the provisions of this article as to any such future transaction. Any assignment, encumbrance or sublease made without Shell's prior written consent or otherwise in violation of this Lease shall be null and void.

9.2 Particular Acts. Without limitation, each of the following acts shall be considered an assignment subject to article 9.1: ( (a) The transfer of Lessee's interest in this Lease upon death, whether by will or operation of law.

(b) Lessee becomes bankrupt or insolvent, makes an assignment for the benefit of creditors or institutes a proceeding under the Bankruptcy Code; provided that, in any of the foregoing cases, Lessee or other affected party shall have 60 days in which to have an involuntary proceeding dismissed.

(c) A writ of attachment or execution is levied on this Lease and not removed by Lessee within 30 days.

(d) In any proceeding or action to which Lessee is a party, a receiver is appointed with authority to take possession of the Premises and such receiver is not removed within 60 days.

(e) If Lessee is a partnership, a withdrawal or any change of interest (voluntary, involuntary or by operation of law) of any partner, or the dissolution of the partnership.

(f) If Lessee is a corporation, any dissolution, merger, consolidation or other reorganization, or other arrangement having similar effect, or the sale or transfer by Lessee or any shareholder of 10% or more of the voting shares of the capital stock of Lessee or of any lesser interest which cumulatively vests 10% or more of such voting shares in the transferee.

(g) If Lessee is composed of more than one person, any change of interest (voluntary, involuntary or by operation of law) of any such person.

9.3 Shell's First Refusal Right. Lessee may not sell, transfer or assign any of Lessee's interest in this Lease without first offering in writing to sell, transfer or assign the same to Shell or its designee on terms and conditions which are the same as those of the proposed sale, transfer or assignment to the third party. If Shell declines or does not accept the offer within 30 days from its receipt thereof and of a complete and exact copy of such third party offer, Lessee may make the proposed sale, transfer or assignment to such third party if Shell gives its consent thereto as provided in article 9.1 hereof, but not at a lower price or on more favorable terms than those so offered to Shell. If

such sale, transfer or assignment to such third party is not consummated within four months from Shell's receipt of the foregoing offer to it, Lessee shall re-offer the Interest to Shell in accordance with the foregoing provisions. If Lessee is a partnership or corporation, the provisions of this article 9.3 shall be deemed to apply to any assignment described in article 9.2(e) or 9.2(f), as the case may be.

9.4 Assignment by Shell. Shell shall have the right to sell, transfer or assign its interest in this Lease and the Premises. Following any assignment of this Lease by Shell, Shell's assignee shall be substituted for Shell with respect to the rights and obligations of Shell provided herein.

**TERMINATION OR NONRENEWAL BY SHELL—OTHER REMEDIES**

10.1 Termination. Subject to any limitations imposed by law, Shell may, at its option, terminate this Lease upon notice (or advance notice if and as required by law) to Lessee for any one or more of the following grounds:

(a) failure by Lessee to comply with any provision of this Lease, which provision is both reasonable and of material significance to the relationship hereunder;

(b) failure by Lessee to exert good faith efforts to carry out the provisions of this Lease;

(c) occurrence of an event which is relevant to the relationship hereunder and as a result of which termination of this Lease is reasonable, including events such as:

(1) fraud or criminal misconduct by Lessee relevant to the operation of the Premises;

(2) declaration of bankruptcy or judicial determination of insolvency of Lessee;

(3) continuing severe physical or mental disability of Lessee of at least three months' duration which renders Lessee unable to provide for the continued proper operation of the Premises;

(4) loss of Shell's right to grant possession of the Premises through expiration of an underlying lease;

(5) condemnation or other taking, in whole or in part, of the Premises pursuant to the power of eminent domain;

(6) destruction (other than by Shell) of all or a substantial part of the Premises;

(7) failure by Lessee to pay to Shell in a timely manner when due rent and all other sums to which Shell is legally entitled;

(8) failure by Lessee to operate the Premises for the sale of motor fuel for seven consecutive days, or such lesser period which under the facts and circumstances constitutes an unreasonable period of time;

(9) willful adulteration, mislabeling or misbranding of motor fuels or other trademark violations by Lessee;

(10) knowing failure of Lessee to comply with federal, state or local laws or regulations relevant to the operation of the Premises;

(11) conviction of Lessee of any felony involving moral turpitude; and

(12) death of Lessee, or if Lessee is a partnership or corporation, death of any partner or shareholder, as the case may be, who owns at least a 50% interest in Lessee, or who owns a lesser interest of at least 25% and is active in the management of Lessee;

(d) a determination is made by Shell in good faith and in the normal course of business to withdraw from marketing of motor fuel through retail outlets in the relevant geographic market area in which the Premises are located; and

(e) any other ground for which termination is provided for in this Lease or in any related agreements constituting a franchise between Shell and Lessee, or is otherwise allowed by the PMPA or other applicable law.

10.2 Termination Prior to Effective Date. If, after execution but prior to the effective date of this Lease, Shell has grounds to terminate or not renew any then existing Motor Fuel Station Lease between Shell and Lessee covering the Premises, or to terminate this Lease as if it were then in its term, Shell may terminate this Lease, as well as any such then existing lease, based on such grounds.

10.3 Nonrenewal. Subject to article 14 and any limitations imposed by law, Shell may, at its option, fail to renew this Lease or any franchise relationship existing with respect thereto upon notice (or advance notice if and as required by law) to Lessee for:

(a) any one or more of the grounds specified in article 10.1(a) through 10.1(d); and

(b) any other ground for which nonrenewal is provided for in this Lease or in any related agreements constituting a franchise between Shell and Lessee or is otherwise allowed by the PMPA or other applicable law.

10.4 Acts Attributable to Lessee. In determining whether a ground for termination or nonrenewal exists under this article 10: the acts or omissions of Lessee's employees, agents and contractors shall be deemed to be the acts or omissions of Lessee, and (a) if Lessee is composed of more than one person, the acts or omissions of each such person shall be deemed to be the acts or omissions of Lessee, or (b) if Lessee is a partnership or corporation, the acts or omissions of the Key Management Person designated in PART I, if any, and of each partner or shareholder, as the case may be, shall be deemed to be the acts or omissions of Lessee.

10.5 Other Remedies. Following any termination or the expiration of this Lease, (a) Shell may re–enter and repossess the Premises, without limitation of any other rights or remedies available to it under this Lease or otherwise, and (b) Lessee shall peaceably surrender the Premises to Shell. As to any of Lessee's property which Lessee fails to remove from the Premises at the termination or expiration of this Lease, Shell shall have the right to sell all or any part of same for Lessee's account on such terms as Shell may desire, but with the rights in Shell to apply the proceeds of such sale, after reimbursing itself for the costs thereof, to the payment of any indebtedness of Lessee to Shell, and to purchase any or all such personal property. All sums due by Lessee to Shell under the provisions of this Lease shall be payable by Lessee to Shell as provided herein, and shall bear interest at the rate of 10% per annum (or lesser maximum rate permitted by law) from the date due until paid. Either party's right to require strict performance of the other's obligations hereunder shall not be affected by any previous waiver, forbearance, course of dealing, or trade custom or usage.

**UNDERLYING ESTATES— CONDEMNATION**

11.1 General. If Shell does not own the Premises, this Lease (a) is subject to all conditions or restrictions affecting the lease under which Shell is now entitled to possession, including, but not limited to, any special conditions or restrictions specified in PART I, and (b) shall terminate upon expiration or any sooner termination (by Shell or otherwise) of such lease if and as permitted by law; and Lessee shall not commit or permit any act or omission which would impair or jeopardize Shell's interest under its lease. If all or any part of the Premises is condemned for public or quasi–public use as provided in article 10.1(c)(5), or is (as it may be) voluntarily conveyed by Shell to any party having and intending to exercise the power so to condemn, either Shell or Lessee may terminate this Lease by giving the other notice (or advance notice if and as required by law); and whether or not this Lease is so terminated, Lessee assigns to Shell all of Lessee's right to or interest in any award or settlement for such condemnation or conveyance in lieu thereof subject to any applicable requirements of the PMPA, provided that, Lessee shall retain the right hereunder to pursue directly against the condemning party any claim Lessee may otherwise have under applicable law to receive compensation for business relocation expense or for loss of business opportunity or good will.

11.2 Notice—Expiration of Underlying Lease. Lessee is hereby notified that Shell does not own the land covered by this Lease, but it leases such land from a third party under an underlying lease which, by its terms, will expire on the date set forth in PART I or is otherwise subject to termination on such date. Accordingly, Lessee is hereby also notified that Shell's underlying lease might expire or end on such date and not be extended or renewed, with the result that, depending on the ending date of the term of this Lease set forth in PART I, this Lease and any related agreements constituting the franchise between Shell and Lessee (a) may be terminated during their terms, (b) may not be renewed or (c) may be renewed or extended for a limited duration only. If Shell's underlying lease should be continued, extended or renewed beyond the above date, then Shell will expect to continue in effect or renew (as the case may be) this Lease and any such related agreements if and as required by applicable law, provided other grounds for termination or nonrenewal do not then exist.

**LESSEE'S BUSINESS**

12. Nothing in this Lease shall be construed as reserving to Shell any right to exercise any control over, or to direct in any respect the conduct or management of, the business or operations of Lessee on the Premises; but the entire control and direction of such business and operations shall be and remain in Lessee, subject only to Lessee's performance of the obligations of this Lease. Neither Lessee nor any person performing any duties or engaged in any work on the Premises for or on behalf of Lessee shall be deemed an employee or agent of Shell, and none of them is authorized to impose on Shell any obligations or liability whatever. Except as provided by law, nothing in this Lease, or now or ever hereafter on or part of the Premises, shall be construed as granting to Lessee any franchise, license or other right to use any of Shell's trademarks, brand names, service marks or color schemes; and Shell reserves the right to remove or obliterate any thereof now or ever hereafter on or part of the Premises as to which Lessee does not have the right of use under any separate agreement.

**NOTICES**

13.1 General. Except as otherwise specified herein, every notice hereunder shall be in writing and, subject to any requirements of law, may be given to Lessee by personal service or to either Lessee or Shell by certified letter, telegram, electronic mail, mailgram, or overnight or local courier, and, in the latter instances, shall be deemed given when the letter is deposited in the U.S. mail or the telegram or other such communication is deposited with the dispatching agency, postage or charges prepaid, and directed to the party for whom intended at such party's address first herein specified, or at such other address as such party may have substituted therefor by notice so given to the other.

13.2 Personal Service—Business Entity or Joint Lessee. If Lessee is a business entity, Shell may give notice by personal service on (a) the Key Management Person designated in PART I pursuant to article 16.3, if any, (b) any officer or director of a corporation, (c) any partner of a partnership or (d) any personal representative, agent or employee of any other business entity. If Lessee is composed of more than one person, such notice may be given to any such person who is an individual or to any such person who is a business entity in the manner provided next above.

**CONTINUATION OF RELATIONSHIP**

14. Neither Shell nor Lessee shall have any obligation to renew this Lease or continue their relationship established hereunder beyond the term provided in article 3, or any extension thereof agreed to in writing by Shell and Lessee, except if and as required by law. If by operation or effect of law Shell is required to continue its relationship established hereunder with Lessee beyond the term specified in article 3 and the parties fail to extend or renew this Lease by written instrument, then the term of this Lease shall be extended on a month–to–month basis on the same terms and conditions as were last provided in this Lease for not more than six successive months, subject (a) to termination by either party as herein provided or (b) to nonrenewal by Shell at the end of any such month.

**RELATION TO EXISTING LAW**

15. To the extent that any provision of this Lease is in conflict with any valid and enforceable law existing on the effective date hereof, such provision shall be deemed amended to conform with such law as it applies to this Lease at the time either party takes any action or exercises or claims any right under such provision.

**BUSINESS ENTITY OR JOINT LESSEE**

16.1 General. This article shall apply if Lessee is a business entity or composed of more than one person (i.e., any combination of individuals and business entities).

16.2 Joint and Several Obligations. If Lessee is composed of more than one person, the obligations imposed hereunder shall be joint and several as to each such person, and all such obligations shall be deemed to apply to each such person with the same effect as though such person were the sole Lessee.

16.3 Personal Obligations and Provisions. If Lessee is a business entity, all obligations and provisions hereof of a personal nature shall apply as if such business entity were an individual, and shall also apply insofar as is legally possible and reasonably practicable to those individual persons who have or exercise management responsibility for such business entity, including, without limitation, officers, directors or agents of corporations and partners of partnerships. Such business entity shall manage its affairs with respect to the personal obligations and provisions in a manner so as to give full force and effect to same. If Lessee as a business entity has initially designated in PART I or subsequently designates a "Key Management Person" who has or exercises primary management responsibility for Lessee's day-to-day operations, Shell shall be entitled to look to such designated Person in connection with the application of such obligations and provisions of a personal nature. Subject to Shell's prior written approval, which shall not be unreasonably withheld, Lessee may at any time, as appropriate, initially designate or make a substitute designation of a Key Management Person.

**EXCUSES FOR NON-PERFORMANCE**

17. Either Shell or Lessee shall be excused from its obligations under this Lease (except financial) to the extent that performance is delayed or prevented by any circumstances reasonably beyond such party's control; or by fire, explosion, mechanical breakdown, strikes or other labor trouble, plant shutdown, riots or other civil disturbances, or voluntary or involuntary compliance with any law, regulation or request of any governmental authority. Any nonperformance excused under this article 17 shall not deprive either Shell or Lessee of any remedy otherwise existing under article 10 hereof or the PMPA.

**ENTIRETY—EXECUTION—SUCCESSION**

18. This Lease terminates, as of its effective date, any prior lease by Shell to Lessee of the Premises, and merges and supersedes all prior representations and agreements, and constitutes the entire contract between Shell and Lessee concerning the subject matter or in consideration hereof. Neither this Lease nor any subsequent agreement amending or supplementing this Lease shall be binding on Shell unless and until it is signed for Shell by a duly authorized representative. Subject to the foregoing provisions hereof, this Lease shall bind and benefit Lessee's heirs, estate and assigns, and Shell's successors and assigns.

* * *

Exhibit A
to Motor Fuel Station Lease

LESSEE'S MAINTENANCE OBLIGATIONS (SEE ALSO ARTICLES 1(e) AND 6)
(Note: "Maintain" includes repairs and replacement unless otherwise stated)

A. Yard

1. Maintain all elements within planter areas as necessary to retain a healthy and attractive appearance. Items include, but are not limited to, all live and artificial plantings (shrubs, grass, flowers, trees, etc.), decorative rock, bark and the entire sprinkler system.
2. Regularly remove weeds, leaves, debris and litter from the Premises (including rain gutters and downspouts and adjacent sidewalks, driveways and easements).
3. Remove snow and ice from the Premises (including adjacent sidewalks, driveways and easements).

B. Lighting

Maintain all lamps and bulbs, ballasts, ballast wiring, starters and sockets in the interior of building. Excludes total fixture replacement.

C. Plumbing

1. Clear clogged toilets, sinks, building lube bay drains and on-property sewer lines. Clean oil separators and catch basins.
2. Maintain all flush mechanisms and faucets.
3. Drain water lines to prevent freezing.
4. Empty septic tanks as necessary.

D. Heating/Air Conditioning

Provide seasonal inspection and service for heating and A/C systems (to include: tighten belts, lubricate bearings, clean/adjust furnace burners, add air conditioner refrigerant) and replace air filters. Maintain any window air conditioner units in entirety.

E. Glasswork

Replace all window and door glass, whenever scratched, cracked or broken from whatever cause. Includes bullet-resistant glass or plastic.

F. Floors

Restore floors to original condition upon removal of equipment installed by or at request of Lessee, subject to normal wear and tear.

G. Painting

During the interval between periodic general repainting by Shell, wash and paint all curbs, yard and building equipment, interior/exterior walls, doors, ceilings and shelving as necessary. Paint to be furnished by Shell; all other painting materials by Lessee.

H. Tanks

1. Check daily for leakage and water using water-finding paste. Maintain daily inventory control as specified in article 6.3. (Failure by Lessee to monitor tanks daily for contaminates and product loss may expose Lessee to responsibility for lost product and payment of Shell's cleanup or repair costs, or both).
2. Empty waste oil tank, using legally acceptable method of disposal. Obtain and pay for necessary regulatory permits for proper disposal, and maintain document records as required by law.
3. Keep fills and access boxes clear of ice, snow, water and debris.

I. Pumps/Dispensers

1. Lubricate any gasoline suction pumps in use (where motor and pump are contained in dispenser housing). Lubricate suction pump weekly or per manufacturer's recommendations.
2. Maintain gasoline hoses, clamps, retractor cable, nozzles, swivels and colored scuff guards, including any associated with a vapor recovery system; check daily for visible leaks.
3. Maintain air and water hoses, nozzles, couplings and air chucks.

J. Air Compressor

Drain water daily. Add/change oil, replace air filters and lubricate bearings per manufacturer's specifications.

K. C-Store/Food Mart and Related Equipment (if located on Premises)

1. Maintain Shell-owned cooler/freezer doors and refrigeration units (walk-in and freestanding), gondolas and all other Shell-owned C-store/food mart related equipment, in cluding lamps, ballasts, fuses and glass therein.
2. Keep all food handling equipment and food preparation areas clean, sanitary and in compliance with applicable codes and laws.
3. Keep all equipment drain lines clean and clear.

L. Car Wash Equipment (if located on Premises)

Maintain all elements of Shell-owned car wash equipment, including any optional or add-on equipment systems with control and connection hardware, and all elements of any water reclaim system. This excludes complete equipment package replacements.

M. Other Equipment

1. Maintain all Lessee-owned equipment.
2. Furnish and maintain portable fire extinguishers.

N. Miscellaneous

1. Maintain all building locks, keys, door closers and latches.
2. Maintain all elements of overhead doors, excluding total door replacement.
3. Reset circuit breakers, replace electrical fuses.
4. Keep restrooms at all times neat, clean, safe and orderly, free of offensive odors and well-stocked with proper supplies and cleaning materials.
5. Take all necessary pest control measures.

Station Location: 20642 SR 7
BOCA RATON, FL 33434
Dealer WIC # 20908550724

SUPPLEMENT TO MOTOR FUEL STATION LEASE
BETWEEN SHELL OIL COMPANY AND PASQUALE PERROTTA
DOING BUSINESS AS SHADOWWOOD PLAZA SHELL
EFFECTIVE November 1, 1994

SPECIAL CONDITIONS/RESTRICTIONS AFFECTING UNDERLYING LEASE (SEE ARTICLE 11/11.1)

SEE CONDITIONS/ RESTRICTIONS ATTACHED

Base lease expires September 30, 1997



Station Location: 20642 SR 7
BOCA RATON, FL 33434
Dealer WIC # 20908550724

## DEALER AGREEMENT

**THIS IS AN AGREEMENT** effective November 1, 1994 between SHELL OIL COMPANY, Hillsboro Center, 600 West Hillsboro Blvd., Suite 250, Deerfield Beach, FL 33441 ("Shell") and PASQUALE PERROTTA, doing business as SHADOWWOOD PLAZA SHELL, 3163 NE 8TH AVE., BOCA RATON, FL 33434 ("Dealer").

PART I of this Agreement sets forth the particular provisions of this Agreement and includes the executions of this Agreement by Shell and Dealer and any Special Provisions which may be applicable, and PART II sets forth the general provisions of this Agreement and includes any Supplements to this Agreement which may be referred to in any such Special Provisions. The provisions of any such Special Provisions and Supplements shall control to the extent of any conflict between such provisions and the body of this Agreement. The numbers in the left column in PART I relate to applicable articles in PART II.

## PART I

Article No.

4. Term of Agreement begins on the effective date specified above and ends on October 31, 1999.

5. Dealer's Station located at 20642 SR 7, BOCA RATON, FL 33434.

7.1 Petroleum Products quantities:

MOTOR FUEL QUANTITIES (IN THOUSANDS OF GALLONS)

| PRODUCT | JAN | FEB | MAR | APR | MAY | JUN | JUL | AUG | SEP | OCT | NOV | DEC |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| GASOLINE | 140 | 140 | 140 | 140 | 140 | 140 | 140 | 140 | 140 | 140 | 140 | 140 |
| DIESEL | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 10 |

11.1(a) Specified hours of operation: 24 hours each day.

SPECIAL PROVISIONS:

— EPA Gasoline Regulations. The Supplement hereto entitled "EPA Gasoline Regulations Supplement" shall govern compliance at Dealer's Station with the regulations of the Environmental Protection Agency concerning unleaded gasoline and gasoline volatility.

— Imprinter/EPOS Equipment. The Supplement hereto entitled "Imprinter/EPOS Equipment Lease Supplement" shall govern the leasing by Shell to Dealer of the equipment ("Equipment") described in the equipment rental schedule ("Schedule") below. If any changes occur in the description, number or rental of any item of the Equipment, Shell and Lessee will execute a new Supplement which shall replace, as of its effective date, the following schedule and original Supplement or any later Supplement at the time in effect, as the case may be.

EQUIPMENT RENTAL SCHEDULE:

| EQUIPMENT UNIT | MONTHLY NUMBER OF UNITS | MONTHLY RENT PER UNIT | RENT ALL UNITS |
|---|---|---|---|
| A-M International Descriptive Biller Imprinter | 1 * | $4 | $0 * |
| Electronic POS Terminal | | | |
| Manufacturer: VERIFONE/LEASED Model No.: ZON II XPE | 1 | $200 | $200 |
| Total Monthly Rent | | | $200 ** |

* Number of units shown includes one imprinter for each EPOS terminal leased to Dealer, if any, but the monthly rent shown for all units excludes any such imprinter(s) which is/are provided to Dealer without charge to back up such terminal(s).

** Notwithstanding the terms of this Supplement, if on the effective date hereof Shell is billing Dealer for imprinters on an annual basis ($48.00 per imprinter per year beginning January 1, to be prorated for any partial year), Shell may continue to do so until it elects to convert to monthly billing, at which time the unearned portion of any prepaid annual rent will be reimbursed or credited to Dealer.

NOTE TO DEALER: BE SURE YOU READ AND UNDERSTAND ALL PROVISIONS OF THIS BINDING DOCUMENT BEFORE YOU SIGN, INCLUDING ALL PAGES WHICH FOLLOW.

EXECUTED on the date(s) shown below.

PASQUALE PERROTTA
d/b/a SHADOWWOOD PLAZA SHELL

P. Perrotta

Date: 6-9-94

SHELL OIL COMPANY

By M Pellino
J. M. PELLINO,
AREA/TERRITORY MANAGER

Date: 6-9-94

PART II

**DEFINITIONS**

1. As used in this Agreement, whether in the singular or plural:

a) alteration shall mean any addition or change to, or modification, removal or replacement of, any building, improvement or equipment at Dealer's Station;

(b) business entity shall mean any legal entity which is not an individual, including, without limitation, a partnership, corporation, trust, estate or association;

(c) Dealer's Station or Station shall mean the motor fuel dispensing station and associated facilities to be operated by Dealer hereunder, including the land occupied for such use, and the buildings, improvements and equipment now or hereafter located on the land;

(d) expiration shall mean the coming to an end of the term provided in article 4, or of any extension thereof provided in article 23 or otherwise agreed to in writing by Shell and Dealer;

(e) law shall mean any applicable statute, constitution, ordinance, regulation, rule, administrative order or other requirement of any federal, state or local government agency or authority, which, unless otherwise specified herein, is in effect either at the time of the execution of this Agreement or any other time during the term;

(f) maintenance or maintain shall mean, unless the context otherwise indicates, preventive maintenance, repairs, replacement, repainting and cleaning;

(g) nonrenewal shall mean a failure by Shell to continue or extend this Agreement at the conclusion of the term provided in article 4, or of any extension thereof provided in article 23 or otherwise agreed to in writing by Shell and Dealer;

(h) PMPA shall mean the Petroleum Marketing Practices Act (15 U.S.C. • 2801 et seq.);

(i) Petroleum Products shall mean Shell branded motor fuels and automotive lubricants as specified in the schedule in PART I (article 7.1) or, if not so specified, as Shell may make available for purchase by Dealer; and such term shall be deemed to include any alternative or "clean" fuel ("clean fuel")
made available by Shell to Dealer for resale at the Station pursuant to a requirement of law, whether or not Shell branded;

(j) Shell's Identifications shall mean any of Shell's trademarks, brand names, service marks or color schemes;

(k) Plant shall mean the distributing plant from which deliveries of Petroleum Products are ordinarily made to Dealer under this Agreement, the location of which may be changed from time to time at Shell's discretion; and

(l) termination shall mean the ending of the term for any reason before expiration, as defined herein.

**PURPOSE**

2. Shell's Identifications have come to represent to the motoring public the manufacture and sale of quality petroleum and automotive products. The standards and requirements established for Dealer in this Agreement are for the purpose of preserving and continuing the consuming motoring public's confidence in and acceptance of Shell's products, to the benefit of such consumers, Shell, Dealer and all other authorized Shell dealers. Dealer, who desires to operate a Shell automobile service station or motor fuel dispensing station as an independent businessman, recognizes the need for Dealer's compliance with such standards and requirements to prevent detriment and injury to such consumers and Shell, as well as to Dealer and such other dealers.

**GRANT—SHELL'S IDENTIFICATIONS**

3.1 General. Shell hereby grants to Dealer the right to use Shell's Identifications to identify and advertise for resale at Dealer's Station the Petroleum Products and other Shell branded products Dealer may purchase. However, Dealer shall not sell, under Shell's Identifications, any products other than Shell products, or any mixture or adulteration of any of the Shell products with each other or with any other product or material. If Dealer ceases to sell the Petroleum Products or uses

Shell's identifications in a manner which deceives or causes a likelihood of confusion to the motoring public, or if this Agreement terminates for any reason, Dealer shall immediately and completely discontinue the use of Shell's identifications. All signs and other advertising devices, heretofore and hereafter furnished hereunder by Shell to Dealer, shall remain Shell's property, shall be used solely in connection with Dealer's sale of Shell products, and shall be returned to Shell immediately upon demand.

3.2 Nonexclusive. Nothing in this Agreement shall be construed as a grant of an exclusive territory to Dealer for the marketing of any Shell products, or as a restriction upon the right of Shell to market its products to any purchasers in any area.

**TERM**

4. This Agreement shall be binding from execution and shall be in effect for the term set forth in PART I, unless extended pursuant to article 23 or otherwise by written agreement, but may be terminated by Dealer at any time by giving Shell at least 90 days' notice, or may be terminated by Shell as provided in the succeeding articles hereof.

**PLACE OF BUSINESS—FAILURE TO MAINTAIN**

5. Dealer shall be responsible for maintaining, as Dealer's Station, a place of business suitable for the exercise of the rights granted Dealer hereunder which shall be of an architectural design, style, color scheme and layout acceptable to and approved by Shell as being in accordance with Shell's customary motor fuel station standards and specifications. Dealer's Station, as presently existing or proposed for completion or alteration by Shell at the location set forth in PART I, is so approved by Shell. Without Shell's prior written approval, Dealer shall not make any alterations to Dealer's Station, or construct any additional buildings or structures thereat. If Dealer fails to exercise the rights granted hereunder by failing either to maintain a suitable place of business as above provided for any period of 60 consecutive days or to maintain at Dealer's Station a representative amount of each grade of Shell branded motor fuel for resale to the public from dispensers bearing Shell's identifications for any period of seven consecutive days, or such lesser period which under the facts and circumstances constitutes an unreasonable period of time, Shell shall have grounds to terminate or not renew this Agreement and any related agreements constituting the franchise between Shell and Dealer on notice (or advance notice if and as required by law) to Dealer.

**USE**

6. Except with the prior written consent of Shell, Dealer's Station shall be used for operation of the motor fuel dispensing station and associated facilities existing on the effective date of this Agreement or thereafter completed or installed by Shell or with Shell's consent. Authorized use shall include the retail sale of petroleum products and carry-out automotive accessories, but excludes any automotive repairs or services except such incidental services as are normally provided to vehicles receiving motor fuel while at the motor fuel dispensing driveway area. Authorized use shall also include the operation of any convenience store, food mart, car wash or other non-gasoline facility at the Station according to standards established by Shell for such facility. Dealer shall not permit any consumption of intoxicating beverages or use of illegal drugs on the Station premises. Dealer shall comply with all laws, licenses and permits relating to the Station or any use thereof or to any act or activity thereat, including, without limitation, any such laws, licenses and permits pertaining to environmental protection. Dealer shall not (a) commit or permit any fraudulent or illegal act or activity at the Station or in connection with the performance of this Agreement or (b) maintain or permit any animal or condition at the Station which may endanger the health, safety or well-being of persons on the Station premises.

**PRODUCTS—QUANTITIES**

7.1 Products—Quantities—Quality. Shell shall sell and deliver to Dealer, and Dealer shall purchase and accept from Shell, such quantities of Petroleum Products as Dealer shall order from time to time during the continuance of this Agreement for delivery at Dealer's Station, but during each calendar month (a) not more (except at Shell's option) than the quantities of Shell motor fuels as specified in PART I or (b) not more than the quantities of Shell lubricants which Shell may make available for purchase by Dealer. The Petroleum Products shall be of the kinds, grades, brands and quality being sold generally by Shell at the time of delivery from the Plant. The quantities of motor fuel specified shall be subject to reduction or adjustment pursuant to any applicable Federal or state mandatory or voluntary allocation program which may be in effect at any time, and, whether or not any such allocation program exists, shall further be subject to reduction or discontinuance in accordance with article 16. If Dealer's Station is equipped to offer a clean fuel as defined in article 1(i), Dealer shall continuously maintain in stock and offer for sale such fuel.

7.2 Change—Discontinuance. Shell may at any time or times change the grade, specifications, characteristics, delivery package, brand name or other distinctive designation of any Petroleum Product, and such Product as so changed shall remain fully subject to this Agreement. Shell may at any time discontinue the sale of any such Product at the Plant or other place from which deliveries are ordinarily made hereunder, in which event both Shell and Dealer shall be relieved of any further obligation hereunder with respect to such Product.

7.3 Other Products. The sales and purchases of any Shell products other than the Petroleum Products, which Dealer desires to purchase from Shell and Shell elects to sell to Dealer, shall be on the terms and conditions of this Agreement, except as otherwise agreed by Shell and Dealer.

**PRICES—PAYMENT**

8. The prices shall be: (a) for motor fuels, the dealer prices for the respective grades and brands delivered in effect at the time loading commences at the Plant and for the place of delivery; and (b) for lubricants or any other products, the dealer prices for the respective grades, brands, containers and quantities delivered, in effect at the time loading commences at the Plant and for the place of delivery, including any applicable listed quantity differentials. Such current dealer prices may be ascertained at Shell's offices first herein specified or at such other place as may be designated by Shell. Dealer shall pay for products delivered on such terms as Shell may prescribe from time to time, any of which may be altered or revoked by Shell at any time by telephone or regular mail. Such terms may include bank draft or electronic funds transfer initiated by Shell, and Dealer shall provide any written authorizations required for such purpose. Shell may assess a reasonable charge upon Dealer for any payment items which are returned or rejected for lack of sufficient funds or any other reason within Dealer's control.

**DELIVERIES**

9.1 General. Deliveries shall be made at Dealer's Station by any means of transportation and in delivery equipment Shell may select. Shell shall not be obligated to make any delivery outside of its usual business hours or, as to motor fuels, in any quantity less than the maximum full load delivery permitted by law. Dealer shall be responsible for back-haul charges if Dealer without justification fails to accept all or part of any delivery thereunder.

9.2 Change. Shell shall have the right from time to time to change the place of delivery of any Petroleum Product from destination (i.e., Dealer's Station) to origin (i.e., the Plant) or from origin to destination, and to change any origin point to a new one designated by Shell, by giving Dealer at least 15 days' prior notice or such shorter notice as may be reasonable in emergency situations. Such notice shall specify the new place of delivery and, for Dealer's information, the then-current dealer price for the affected Product, FOB that place. If origin delivery is designated in any such notice, Shell shall be responsible for providing or arranging for transportation of the Product, at Dealer's expense, from the origin point to Dealer's Station at rates not exceeding those generally available from common carriers at the time of delivery.

**TRAINING**

10. Unless Dealer has already done so prior to Dealer's execution of this Agreement, Dealer shall prior to the effective date hereof (or, with Shell's consent, as soon as practicable thereafter) satisfactorily complete Shell's initial training course designed for the operation of a motor fuel dispensing station. Shell will bear only those costs associated with the initial training as have been communicated in writing to Dealer at or prior to the execution of this Agreement. In addition to such initial training, Dealer shall, at Shell's request, subsequently participate in such advanced or refresher courses appropriate for a motor fuel dispensing station as Shell may offer from time to time. In connection with any such subsequent training, Shell shall bear the cost of the training center, instructors and all training materials, but Shell will have no obligation to compensate Dealer for, or bear any of Dealer's personal expenses associated with, attendance. While participating in any training, Dealer shall never be deemed to be an employee, agent or servant of Shell nor in any way eligible to receive any of the benefits which normally accrue to employees of Shell. To enhance the expeditious meeting of safety, operational and customer needs, all training courses, programs and tests offered by Shell shall be given only in the English language.

**STANDARDS OF OPERATION AND APPEARANCE**

11.1 Standards. Dealer shall operate Dealer's Station according to the following standards of operation and appearance developed by Shell, but the means and manner of performance shall be within the sole discretion of Dealer:

(a) Merchandising—Hours. Dealer shall diligently and efficiently merchandise and promote such Petroleum Products as may be purchased by Dealer hereunder under Shell's identifications so as to maintain the good reputation and public acceptance thereof, and, to assure that end, shall keep Dealer's Station open for the sale of motor fuel and fully illuminated during the hours and days set forth in PART I. Such hours of operation shall be subject to adjustment if and as required by law. In merchandising products and services, Dealer shall give due consideration to the full use of Shell's latest merchandising planning guidelines provided to Dealer from time to time. Dealer shall personally and actively manage the business conducted at Dealer's Station to assure good faith compliance with this article 11.1(a) and other provisions of this Agreement.

(b) Service Work. If article 6 authorizes automotive repairs and service work, all such work performed by Dealer and Dealer's employees shall be done in a workmanlike manner utilizing only first–class new materials and parts except when the customer specifically authorizes rebuilt or used materials or parts.

(c) Staffing. Dealer shall maintain an adequate and competent staff of employees, considering both the volume and nature of the business activity, to fulfill efficiently Dealer's obligations hereunder. To enhance the expeditious meeting of safety, operational and customer needs, Dealer and Dealer's employees, agents and contractors shall have the ability to converse with customers, government officials, Shell representatives and other employees, agents and contractors in English. Dealer shall have the responsibility to train Dealer's employees, and shall have available and utilize training equipment, materials and programs as made available by Shell from time to time for this purpose.

(d) Customer Complaints. Dealer shall conduct Dealer's operations in a professional and business–like manner in order to avoid customer complaints. Dealer shall promptly and courteously respond to any customer complaints received (including written responses when appropriate) and take immediate action to correct or satisfactorily resolve each legitimate customer complaint.

(e) Maintenance—Housekeeping. Except as Shell may expressly have responsibility therefor under any separate agreement, Dealer shall at all times maintain Dealer's Station (including adjacent sidewalks and driveways, easements and all landscaped areas) and Dealer's own property and equipment thereat in good condition and repair, and keep the same (including the rest rooms) neat, clean, safe and orderly.

(f) Vehicles—Other Mobile Equipment. The premises at Dealer's Station shall be kept clear of vehicles, other mobile equipment and obstructions which may restrict traffic flow, endanger customer safety or detract from appearance. Dealer's Station may not be used for the selling, leasing, parking or storing of motor vehicles, trailers, boats or other mobile equipment.

(g) Uniforms. Dealer and Dealer's employees shall neatly wear clean uniforms of a type and style approved by Shell.

(h) Lighting. Dealer shall use sufficient lighting and illuminated signs to provide full visibility of Dealer's Station, including enclosed areas, at all times while open for operation.

(i) Signs. Dealer shall have the right to display in a neat and orderly manner at Dealer's Station, but not affixed to the exterior of any building or the pole support(s) for the main identification sign(s), such briefly worded and professional–looking signs as are necessary to identify the products and services offered and their prices, but shall not display or use any other signs, posters, flags, pennants or other advertising devices without Shell's prior written approval, which shall not be unreasonably withheld.

(j) Vending and Displays. Before installing or replacing any vending machine or display equipment for merchandising sundry convenience items at Dealer's Station, Dealer shall obtain Shell's prior written approval, which shall not be unreasonably withheld, as to its size, kind, appearance and placement. Video or other game machines are not permitted. Dealer shall not display or offer merchandise or paraphernalia which is morally offensive or distasteful to the general public.

(k) Loitering. Dealer shall keep Dealer's Station free from loitering by persons who at the time have no proper business purposes thereon.

11.2 Image Excellence Book. Dealer acknowledges receipt from Shell of Shell's "Image Excellence" guidebook, which provides guidelines of objectives as to the operating and appearance standards

established for Shell automobile service stations and motor fuel dispensing stations. Dealer shall maintain Dealer's Station in conformance with such book (as it applies to the permitted use of and operations at Dealer's Station) at all times during the period of this Agreement. Shell may update such book from time to time by providing Dealer a copy of revised material, and may further introduce over a period of time new architectural or graphics standards without affecting such book's application to stations and facilities not yet modified.

**INSPECTION**

12. To the extent reasonably necessary to observe the terms of this Agreement, Shell shall have the right, at all reasonable times, to enter Dealer's Station and to inspect the same, as well as such part of Dealer's books and records as may be material to a proper inquiry hereunder.

**CREDIT CARDS**

13. If and so long as Shell elects to accept specified credit cards, credit indentifications, or other transaction authorization cards in the state in which Dealer's Station is located, and Dealer elects to honor them for purchases of authorized products and services at Dealer's Station, Dealer shall so honor such cards and identifications for all authorized products and services sold at or from Dealer's Station, and account for all such transactions, in strict compliance with the terms and conditions appearing thereon and with the provisions of this article 13 and Shell's "Credit Card Sales Guide" ("Guide") furnished to Dealer (receipt of which Dealer acknowledges by executing this Agreement), or in any revision made by Shell and furnished to Dealer. Shell shall accept from Dealer all authorized invoices or transactions based on such cards or identifications, and, at Shell's option, shall pay the amount of such invoice or transaction to Dealer by check, credit such amount to Dealer's bank account by electronic funds transfer ("EFT") or set off such amount against Dealer's account with Shell, in each case after deducting any service charge to Dealer by Shell on such credit sales in effect under the Guide as then currently revised. For each such invoice or transaction, or portion thereof, which is not authorized, which is for any reason disputed by the customer, or which is otherwise subject to chargeback under the Guide, Shell may either charge such invoice or amount to Dealer's account with Shell or require Dealer to make immediate refund to Shell of such invoice or amount, including refund by draft or EFT initiated by Shell, without deduction for any service charge previously earned thereon by Shell. If Dealer fails to comply with the provisions of this article 13 or the Guide, Shell may, at its option and without limitation of any other rights or remedies available to it under this Agreement or otherwise, limit or cancel Dealer's right to participate in Shell's credit card program.

**TAXES AND CHARGES**

14. Dealer shall pay any tax, duty, fee, assessment or other governmental charge now or hereafter levied on or in connection with any product delivered hereunder, or on any of its constituent materials, or on Shell, or required to be paid or collected by Shell, by reason of the purchase, receipt, importation or manufacture of such product or constituent materials by Shell, or the sale, transportation, storage, delivery, resale or use of the product, insofar as the same is not expressly included in the price hereunder. If Dealer undertakes to pay directly any tax or other governmental charge normally remitted by Shell as the product supplier, Shell may at its option require Dealer to provide bond or other security deemed necessary to protect Shell against loss arising from nonpayment of such tax or charge.

**CLAIMS**

15. Shell shall have no liability to Dealer for any defect in quality or shortage in quantity of any products delivered unless Dealer gives Shell notice of Dealer's claim within (a) 48 hours after delivery for shortages in quantity of motor fuels or (b) within five days after delivery for quality or other quantity deficiencies (or within five days after the discovery of any latent defect in quality), and further provides Shell with reasonable opportunity to inspect the products and take and test samples thereof. Shell shall have no liability to Dealer for any other claim, and Dealer shall have no liability to Shell for any claim (except as set forth in article 20 or for indebtedness or relating to equipment) arising out of or in connection with any sales or deliveries of products by Shell to Dealer hereunder, unless the claimant gives the other party notice of the claim (setting forth fully the facts on which it is based) within 180 days after the date of the sale, delivery or other transaction or occurrence giving rise to the claim.

**EXCUSES FOR NONPERFORM-ANCE**

16. Either Shell or Dealer shall be excused from its obligations under this Agreement (except financial) to the extent that performance is delayed or prevented by any circumstances reasonably beyond such party's control; or by fire, explosion, mechanical breakdown, strikes or other labor trouble, plant shutdown, riots or other civil disturbances, or voluntary or involuntary compliance

with any law, regulation or request of any governmental authority; or by unavailability of or interference with Shell's usual sources of the motor fuels or crude oils or other constituent materials, or the usual means of transporting any of the same. If, due to the foregoing reasons, there should be a shortage of motor fuels from any source, Shell will not be obligated to purchase supplies from any other than its usual sources or to divert supplies in order to perform this Agreement and may apportion its available supplies among its contract and non–contract customers and its own internal uses in such manner as it finds fair and reasonable. Quantities of motor fuels consequentially undelivered will be deducted from the applicable remaining quantity obligation unless the parties agree otherwise in writing. Any nonperformance excused under this article 16 shall not deprive either Shell or Dealer of any remedy otherwise existing under article 18 hereof or the PMPA.

**ASSIGNMENT—ENCUMBRANCE**

17.1 General. This Agreement is personal to Dealer. Except as otherwise provided in this article 17 or by law, Dealer shall not assign or encumber any of Dealer's interest in this Agreement, or assign any claim against Shell arising directly or indirectly out of or in connection with this Agreement, or permit any other arrangement having similar effect of such an assignment or encumbrance, either voluntarily, involuntarily or by operation of law, without Shell's prior written consent, which consent shall not be unreasonably withheld. Each request for Shell's consent to any assignment or encumbrance shall be submitted in the manner specified for notices in article 22.1, and Shell shall have 60 days (or any lesser period specified by law) following its receipt of all qualification information reasonably requested by it in which to grant or withhold its consent in writing. No consent to any assignment or encumbrance shall constitute a waiver of the provisions of this article as to any such future transaction. Any assignment or encumbrance made without Shell's prior written consent or otherwise in violation of this Agreement shall be null and void.

17.2 Particular Acts. Without limitation, each of the following acts shall be considered an assignment subject to article 17.1:

(a) The transfer of Dealer's interest in this Agreement upon death, whether by will or operation of law.

(b) Dealer becomes bankrupt or insolvent, makes an assignment for the benefit of creditors or institutes a proceeding under the Bankruptcy Code; provided that, in any of the foregoing cases, Dealer or other affected party shall have 60 days in which to have an involuntary proceeding dismissed.

(c) A writ of attachment or execution is levied on this Agreement and not removed by Dealer within 30 days.

(d) In any proceeding or action to which Dealer is a party, a receiver is appointed with authority to take over Dealer's interest in this Agreement and such receiver is not removed within 60 days.

(e) If Dealer is a partnership, a withdrawal or any change of interest (voluntary, involuntary or by operation of law) of any partner, or the dissolution of the partnership.

(f) If Dealer is a corporation, any dissolution, merger, consolidation or other reorganization, or other arrangement having similar effect, or the sale or transfer by Dealer or any shareholder of 10% or more of the voting shares of the capital stock of Dealer or of any lesser interest which cumulatively vests 10% or more of such voting shares in the transferee. (g) If Dealer is composed of more than one person, any change of interest (voluntary, involuntary or by operation of law) of any such person.

17.3 Shell's First Refusal Right. Dealer may not sell, transfer or assign any of Dealer's interest in this Agreement without first offering in writing to sell, transfer or assign the same to Shell or its designee on terms and conditions which are the same as those of the proposed sale, transfer or assignment to the third party. If Shell declines or does not accept the offer within 30 days from its receipt thereof and of a complete and exact copy of such third party offer, Dealer may make the proposed sale, transfer or assignment to such third party if Shell gives its consent thereto as provided in article 17.1 hereof, but not at a lower price or on more favorable terms than those so offered to Shell. If such sale, transfer or assignment to such third party is not consummated within four months from Shell's receipt of the foregoing offer to it, Dealer shall re–offer the interest to Shell in accordance with the foregoing provisions. If Dealer is a partnership or corporation, the provisions of this article 17.3 shall be deemed to apply to any assignment described in article 17.2(e) or 17.2(f), as the case may be.

17.4 Assignment by Shell. Shell shall have the right to sell, transfer or assign its interest in this Agreement. Following any assignment of this Agreement by Shell, Shell's assignee shall be substituted for Shell with respect to the rights and obligations of Shell provided herein.

**TERMINATION OR NONRENEWAL BY SHELL—OTHER REMEDIES**

18.1 Termination. Subject to any limitations imposed by law, Shell may, at its option, terminate this Agreement upon notice (or advance notice if and as required by law) to Dealer for any one or more of the following grounds:

(a) failure by Dealer to comply with any provision of this Agreement, which provision is both reasonable and of material significance to the relationship hereunder;

(b) failure by Dealer to exert good faith efforts to carry out the provisions of this Agreement;

(c) occurrence of an event which is relevant to the relationship hereunder and as a result of which termination of this Agreement is reasonable, including events such as:

(1) fraud or criminal misconduct by Dealer relevant to the operation of the Dealer's Station;

(2) declaration of bankruptcy or judicial determination of insolvency of Dealer;

(3) continuing severe physical or mental disability of Dealer of at least three months' duration which renders Dealer unable to provide for the continued proper operation of the Dealer's Station;

(4) if Dealer leases Dealer's Station from Shell, loss of Shell's right to grant possession of Dealer's Station through expiration of an underlying lease;

(5) condemnation or other taking, in whole or in part, of the Dealer's Station pursuant to the power of eminent domain;

(6) loss of Shell's right to grant the right to use Shell's Identifications;

(7) destruction (other than by Shell) of all or a substantial part of the Dealer's Station;

(8) failure by Dealer to pay to Shell in a timely manner when due all sums to which Shell is legally entitled;

(9) failure by Dealer to operate Dealer's Station for the sale of motor fuel for seven consecutive days, or such lesser period which under the facts and circumstances constitutes an unreasonable period of time;

(10) willful adulteration, mislabeling or misbranding of motor fuels or other trademark violations by Dealer;

(11) knowing failure of Dealer to comply with federal, state or local laws or regulations relevant to the operation of Dealer's Station;

(12) conviction of Dealer of any felony involving moral turpitude; and

(13) death of Dealer, or if Dealer is a partnership or corporation, death of any partner or shareholder, as the case may be, who owns at least a 50% interest in Dealer, or who owns a lesser interest of at least 25% and is active in the management of Dealer;

(d) a determination is made by Shell in good faith and in the normal course of business to withdraw from marketing of motor fuel through retail outlets in the relevant geographic market area in which Dealer's Station is located; and

(e) any other ground for which termination is provided for in this Agreement or in any related agreements constituting a franchise between Shell and Dealer, or is otherwise allowed by the PMPA or other applicable law.

18.2 Termination Prior to Effective Date. If, after execution but prior to the effective date of this Agreement, Shell has grounds to terminate or not renew any then existing Dealer Agreement between

Shell and Dealer pertaining to Dealer's Station, or to terminate this Agreement as if it were then in its term, Shell may terminate this Agreement, as well as any such then existing Dealer Agreement, based on such grounds.

18.3 Nonrenewal. Subject to article 23 and any limitations imposed by law, Shell may, at its option, fail to renew this Agreement or any franchise relationship existing with respect thereto upon notice (or advance notice if and as required by law) to Dealer for:

(a) any one or more of the grounds specified in article 18.1(a) through 18.1(d); and

(b) any other ground for which nonrenewal is provided for in this Agreement or in any related agreements constituting the franchise between Shell and Dealer or is otherwise allowed by the PMPA or other applicable law.

18.4 Acts Attributable to Dealer. In determining whether a ground for termination or nonrenewal exists under this article 18: the acts or omissions of Dealer's employees, agents and contractors shall be deemed to be the acts or omissions of Dealer, and (a) if Dealer is composed of more than one person, the acts or omissions of each such person shall be deemed to be the acts or omissions of Dealer, or (b) if Dealer is a partnership or corporation, the acts or omissions of the Key Management Person designated in PART I, if any, and of each partner or shareholder, as the case may be, shall be deemed to be the acts or omissions of Dealer.

18.5 Other Remedies. Any termination under the foregoing provisions of this article 18 shall be without limitation of any other rights or remedies available to Shell under this Agreement or otherwise. All sums due by Dealer to Shell under the provisions of this Agreement shall be payable by Dealer to Shell as provided herein, and shall bear interest at the rate of 10% per annum (or lesser maximum rate permitted by law) from the date due until paid. If Dealer defaults in payment of any indebtedness to Shell, in addition to the rights provided above, Shell shall have the right immediately to suspend deliveries hereunder and to apply any sums which Shell may hold for Dealer's account under this Agreement to the payment of such indebtedness, without relieving Dealer of any obligations otherwise existing to replace the sums so applied. Either party's right to require strict performance of the other's obligations hereunder shall not be affected by any previous waiver, forbearance, course of dealing, or trade custom or usage.

**DEALER'S INDEPENDENCE**

19. Dealer is an independent businessperson, and nothing in this Agreement shall be construed as reserving to Shell any right to exercise any control over, or to direct in any respect the conduct or management of, Dealer's business or operations conducted pursuant to this Agreement; but the entire control and direction of such business and operations shall be and remain in Dealer, subject only to Dealer's performance of the obligations of this Agreement. Neither Dealer nor any person performing any duties or engaged in any work at Dealer's Station for or on behalf of Dealer shall be deemed an employee or agent of Shell, and none of them is authorized to impose on Shell any obligations or liability whatsoever.

**INDEMNITY— REPORTS**

20. TO THE FULLEST EXTENT PERMITTED BY LAW (BUT NO FURTHER) AND WITHOUT IN ANY WAY LIMITING ANY OF DEALER'S OBLIGATIONS UNDER ARTICLE 21 OF THIS AGREEMENT, DEALER SHALL DEFEND, INDEMNIFY AND HOLD HARMLESS SHELL, ITS PARENT, AFFILIATE AND SUBSIDIARY COMPANIES, AND THEIR RESPECTIVE DIRECTORS, EMPLOYEES AND AGENTS, AGAINST ALL CLAIMS, SUITS, LIABILITIES, JUDGMENTS, LOSSES AND EXPENSES (INCLUDING, WITHOUT LIMITATION, ATTORNEYS' FEES AND COSTS OF LITIGATION, WHETHER INCURRED FOR SHELL'S PRIMARY DEFENSE OR FOR SHELL'S ENFORCEMENT OF ITS INDEMNIFICATION RIGHTS HEREUNDER), AND ANY FINES, PENALTIES AND ASSESSMENTS, ARISING OUT OF ANY BODILY/PERSONAL INJURY, DISEASE OR DEATH OF ANY PERSONS OR DAMAGE TO OR LOSS OF ANY PROPERTY (EXCEPT SHELL PROPERTY TO THE EXTENT SHELL HAS RESPONSIBILITY THEREFOR UNDER ANY SEPARATE AGREEMENT), CAUSED BY OR HAPPENING IN CONNECTION WITH THE OPERATION OF DEALER'S STATION, EVEN THOUGH CAUSED BY THE CONCURRENT OR CONTRIBUTORY NEGLIGENCE OR FAULT OF A PARTY INDEMNIFIED; BUT EXCEPTING ANY SUCH INJURY, DISEASE, DEATH, DAMAGE OR LOSS CAUSED BY (A) THE SOLE NEGLIGENCE OR FAULT OF A PARTY OTHERWISE INDEMNIFIED OR (B) DEFECTS IN SHELL PRODUCTS NOT CAUSED OR CONTRIBUTED TO BY ANY NEGLIGENCE OR FAULT OF DEALER OR DEALER'S EMPLOYEES, AGENTS OR CONTRACTORS. WITHIN 24 HOURS AFTER ANY OCCURRENCE WHICH MAY RESULT IN SUCH INJURY, DISEASE, DEATH, DAMAGE OR LOSS, OR SUCH FINE, PENALTY OR ASSESSMENT, DEALER SHALL REPORT THE SAME TO SHELL BY TELEPHONE AND SHALL PROMPTLY THEREAFTER CONFIRM THE SAME BY NOTICE, INCLUDING ALL CIRCUMSTANCES THEREOF KNOWN

TO DEALER OR DEALER'S EMPLOYEES. SHELL SHALL HAVE THE RIGHT, BUT NOT THE DUTY, TO PARTICIPATE IN THE DEFENSE AND SETTLEMENT OF ANY SUCH CLAIM OR LITIGATION WITH ATTORNEYS OF SHELL'S SELECTION WITHOUT RELIEVING DEALER OF ANY OBLIGATIONS HEREUNDER. DEALER SHALL COOPERATE WITH SHELL IN SHELL'S INVESTIGATION AND DEFENSE OF ANY CLAIM OR SUIT. DEALER'S OBLIGATIONS HEREUNDER SHALL SURVIVE ANY TERMINATION OR EXPIRATION OF THIS AGREEMENT.

**INSURANCE**

21. Without in any way limiting any of Dealer's obligations, indemnities and liabilities under article 20 of this Agreement or otherwise, Dealer shall maintain at all times, at Dealer's expense and in compliance with any applicable requirements of law, insurance satisfactory to Shell of the following minimum types and limits:

(a) Workers' Compensation Insurance with statutory limits, and Employers' Liability Insurance with limit of $100,000 each occurrence. Such insurance shall include a waiver of the insurer's rights of subrogation against Shell.

(b) Comprehensive General Liability Insurance (including, without limitation, coverage for premises/operations, operation of vehicles owned, non-owned or hired, products/completed operations, and contractual obligations assumed in article 20 hereof) with a combined limit for bodily/personal injury and property damage of $300,000 each occurrence. If Dealer sells or dispenses alcoholic beverages, such insurance shall include coverage for such activity with a minimum limit of $300,000 each occurrence. Such insurance shall name Shell and any lessor from whom Shell may lease the Station premises as additional insureds.

(c) Environmental Impairment Liability Insurance covering off-site losses, which will be maintained during any period and with such minimum limit as shall reasonably be required by Shell, either initially from the effective date hereof or at any time thereafter, having due regard to the availability of such insurance during any such period. Except with respect to any initial requirement for such insurance which may be specified in PART I, Shell shall give Dealer at least 90 days' notice of any new or modified requirement for such insurance. Such insurance shall include Shell as a named insured.

Any insurance maintained by Dealer pursuant to this Agreement shall be regarded as primary insurance underlying any other applicable insurance. Prior to the effective date of this Agreement and thereafter prior to the expiration of any required insurance, Dealer shall provide Shell with evidence satisfactory to Shell showing that the insurances specified above are in effect and will not be cancelled or materially changed without at least 30 days' prior written notice to Shell. Dealer shall further provide Shell with at least 30 days' prior written notice if any such insurance shall expire for any reason without being replaced with equivalent coverage. Any insurance plan arranged by Shell and participated in by Dealer may provide for the periodic collection by Shell for the insurer of Dealer's premiums as payments due under this Agreement.

**NOTICES**

22.1 General. Except as otherwise specified herein, every notice hereunder shall be in writing and, subject to any requirements of law, may be given to Dealer by personal service or to either Dealer or Shell by certified letter, telegram, electronic mail, mailgram, or overnight or local courier, and, in the latter instances, shall be deemed given when the letter is deposited in the U.S. mail or the telegram or other such communication is deposited with the dispatching agency, postage or charges prepaid, and directed to the party for whom intended at such party's address first herein specified, or at such other address as such party may have substituted therefor by notice so given to the other.

22.2 Personal Service—Business Entity or Joint Dealer. If Dealer is a business entity, Shell may give notice by personal service on (a) the Key Management Person designated in PART I pursuant to article 25.3, if any, (b) any officer or director of a corporation, (c) any partner of a partnership or (d) any personal representative, agent or employee of any other business entity. If Dealer is composed of more than one person, such notice may be given to any such person who is an individual or to any such person who is a business entity in the manner provided next above.

**CONTINUATION OF RELATIONSHIP**

23. Neither Shell nor Dealer shall have any obligation to renew this Agreement or continue their relationship established hereunder beyond the term provided in article 4, or of any extension thereof agreed to in writing by Shell and Dealer, except if and as required by law. If by operation or effect of law Shell is required to continue its relationship established hereunder with Dealer

beyond the term specified in article 4 and the parties do not extend or renew this Agreement by written instrument, then the term of this Agreement shall be extended on a month-to-month basis on the same terms and conditions as were last provided in this Agreement for not more than six successive months, subject (a) to termination by either party at any time as herein provided or (b) to nonrenewal by Shell at the end of any such month.

**RELATION TO EXISTING LAW**

24. To the extent that any provision of this Agreement is inconflict with any valid and enforceable law existing on the effective date thereof, such provision shall be deemed amended to conform with such law as it applies to this Agreement at the time either party takes any action or exercises or claims any rights under such provision.

**BUSINESS ENTITY OR JOINT DEALER**

25.1 General. This article shall apply if Dealer is a business entity or composed of more than one person (i.e., any combination of individuals and business entities).

25.2 Joint and Several Obligations. If Dealer is composed of more than one person, the obligations imposed hereunder shall be joint and several as to each such person, and all such obligations shall be deemed to apply to each such person with the same effect as though such person were the sole Dealer.

25.3 Personal Obligations and Provisions. If Dealer is a business entity, all obligations and provisions hereof of a personal nature shall apply as if such business entity were an individual, and shall also apply insofar as is legally possible and reasonably practicable to those individual persons who have or exercise management responsibility for such business entity, including, without limitation, officers, directors or agents of corporations and partners of partnerships. Such business entity shall manage its affairs with respect to the personal obligations and provisions in a manner so as to give full force and effect to same. If Dealer as a business entity has initially designated in PART I or subsequently designates a "Key Management Person" who has or exercises primary management responsibility for Dealer's day-to-day operations, Shell shall be entitled to look to such designated Person in connection with the application of such obligations and provisions of a personal nature. Subject to Shell's prior written approval, which shall not be unreasonably withheld, Dealer may at any time, as appropriate, initially designate or make a substitute designation of a Key Management Person.

**ENTIRETY— RELEASE— EXECUTION**

26. This Agreement, along with any related agreement(s) which may be executed contemporaneously herewith, comprises the entire agreement, and merges and supersedes all prior agreements, understandings, representations and warranties (oral or written, expressed or implied), between Shell and Dealer covering the sale and delivery of Shell products. All such prior agreements between Shell and Dealer are hereby terminated as of the effective date hereof; and Shell and Dealer hereby respectively release each other, as of the date of each party's execution hereof and to the extent permitted by law, from all claims which each now has against the other (whether or not now known to either), arising directly or indirectly out of or in connection with any such prior agreement or any sales or deliveries of any products by Shell to Dealer thereunder or otherwise, excepting, however, claims of Shell against Dealer for indebtedness, reimbursement or indemnification, or relating to equipment. Neither this Agreement nor any subsequent agreement amending or supplementing this Agreement shall be binding on Shell unless and until it is signed for Shell by a duly authorized representative.

* * *

Station Location: 20642 SR 7
BOCA RATON, FL 33434
Dealer WIC # 20908550724

SUPPLEMENT TO DEALER AGREEMENT
BETWEEN SHELL OIL COMPANY AND PASQUALE PERROTTA
DOING BUSINESS AS SHADOWWOOD PLAZA SHELL
EFFECTIVE November 1, 1994

EPA GASOLINE REGULATIONS SUPPLEMENT

In the operation of Dealer's Station, Dealer shall strictly comply with the regulations of the Environmental Protection Agency ("EPA") promulgated as Part 80 – REGULATION OF FUELS AND FUEL ADDITIVES, of Chapter I, Title 40, Code of Federal Regulations, and with any applicable state regulations covering gasoline volatility, as heretofore or hereafter amended (the "Regulations"). Under the Regulations, Dealer, as a retailer of gasoline, must regularly offer for sale one or more grades of "unleaded gasoline" and, during specified annual summer "regulatory control periods," may not sell, offer for sale or dispense gasoline whose Reid vapor pressure ("RVP") exceeds the "applicable standard." "Gasoline" and other terms used in this Supplement shall have the same meanings as defined in the Regulations or in the Dealer Agreement of which this Supplement is a part. With respect to Dealer's Station, Shell and Dealer will have the following rights and obligations:

(a) Shell's Rights and Obligations. Shell shall:

(1) Make available for sale to Dealer Shell branded gasoline, including one or more grades of unleaded gasoline, complying with the Regulations;

(2) Supply to Dealer the pump notices and labels required for unleaded gasoline by the Regulations;

(3) Continuing for such period as Shell, in its sole judgment, deems appropriate, take periodic samples from the gasoline dispenser(s) of Dealer and/or other dealers supplied from the same Plant and test such samples to determine whether the gasoline is in compliance with the Regulations, any such sampling and testing, however, not to relieve Dealer of any obligation Dealer may otherwise have hereunder or by law to sell, dispense or offer for sale only gasoline complying with the Regulations;

(4) Give prompt notice and details to Dealer (by telephone, followed by formal notice) if any test performed under (3) above or other circumstance known to Shell reflects that Dealer's gasoline inventory is not in compliance with the Regulations, and cooperate with Dealer in the taking of such further action as is necessary (including pump out) to restore the availability of complying gasoline, the costs of any such further action, including further sampling and testing, to be for Dealer's account if the cause of contamination was within Dealer's control;

(5) Arrange for the painting of manhole covers and fill line caps to identify storage tanks dedicated to unleaded gasoline;

(6) Have the right, through its employees, agents or representatives, at all reasonable times for the purpose of determining compliance with this Supplement and the Regulations, to enter upon Dealer's Station premises and utilize Dealer's facilities as necessary to take samples and conduct tests of gasoline offered for sale or dispensing at Dealer's Station and to inspect Dealer's gasoline storage and dispensing systems and records of gasoline receipts and sales or deliveries; and

(7) Have the right, following any default by Dealer under this Supplement, and without limitation of any other rights or remedies available to Shell hereunder or otherwise, to suspend deliveries of gasoline to Dealer and/or enter upon Dealer's Station premises and take such action as is appropriate in its judgment (including padlocking of pump dispensers) to avoid any violation or continued violation of this Supplement or the Regulations.

(b) Dealer's Rights and Obligations. Dealer shall:

(1) Utilize for the storage and dispensing of unleaded gasoline only those facilities which have been approved for such use by Shell;

(2) Properly affix and maintain the pump notices and labels required for unleaded gasoline by the Regulations;

(3) Equip the gasoline pump dispensers (both leaded and unleaded) with nozzles in compliance with the Regulations and maintain such nozzles in good condition and repair and otherwise in compliance with the Regulations;

(4) Establish and enforce a positive program of compliance to assure that Dealer, Dealer's employees or agents, or third parties (including the employees, agents or contractors of Shell) will not cause, allow or permit contamination of Dealer's gasoline by any other gasoline product or foreign substance at any time after delivery by or for Shell to Dealer and prior to introduction by Dealer into any motor vehicle, such program to include, if and as necessary, periodic sampling and testing by Dealer of Dealer's gasoline inventory, the securing of manhole covers, fill line caps and dispensers to avoid unauthorized entry or use and the supervision and instruction of employees and others having access to Dealer's gasoline system regarding proper procedures to prevent contamination of Dealer's gasoline or the introduction of leaded gasoline into vehicles designed only for unleaded gasoline;

(5) Give prompt notice to Shell (by telephone to Shell's District office) of (a) the taking of any gasoline samples at Dealer's Station by a representative of the EPA or state agency to test for compliance with the Regulations, together with all relevant details relating thereto, and (b) the receipt of any test results from any such sampling;

(6) Give prompt notice and details to Shell (by telephone to Shell's District office, followed by formal notice) of any circumstance or occurrence at Dealer's Station which reasonably could cause Dealer's gasoline or gasoline dispensing equipment to be not in compliance with the Regulations; and upon discovery of any such condition cease forthwith to sell, dispense or offer for sale such gasoline until Shell and Dealer can mutually determine by sampling, testing and/or other means whether the gasoline is in compliance, and if found to be not in compliance, take such further action as is necessary (including pump out) to restore availability of a complying product, the cost of such sampling, testing and/or further action to be for Dealer's account if the cause of contamination was within Dealer's control; and

(7) Otherwise comply with all obligations imposed on Dealer by the Regulations, whether or not such other obligations are referred to or restated herein.

Station Location: 20642 SR 7
BOCA RATON, FL 33434
Dealer WIC # 20908550724

SUPPLEMENT TO DEALER AGREEMENT
BETWEEN SHELL OIL COMPANY AND PASQUALE PERROTTA
DOING BUSINESS AS SHADOWWOOD PLAZA SHELL
EFFECTIVE November 1, 1994

IMPRINTER/EPOS EQUIPMENT LEASE SUPPLEMENT

THIS SUPPLEMENT to the above Dealer Agreement ("Agreement") shall be effective from November 1, 1994. This Supplement sets forth the terms and conditions covering the leasing by Shell to Dealer of the equipment ("Equipment") described in the equipment rental schedule ("Schedule") below, and supersedes and replaces any prior leases or Supplement(s) relating to the Equipment or similar equipment. The definitions contained in and the terms and conditions of the Agreement shall apply to the lease of the Equipment hereunder except as set forth herein.

EQUIPMENT RENTAL SCHEDULE: SEE SCHEDULE IN PART I OF AGREEMENT

Dealer shall not add to, modify, replace or remove any of the Equipment, including any of its component parts or associated software, without Shell's prior written consent.

1. RENT—PAYMENT AND ADJUSTMENT. Rent shall be payable in advance by Dealer on or before the first day of each month at the address specified by Shell from time to time, or Shell, at its option, may prescribe that rent be paid when due by draft or electronic funds transfer initiated by Shell. Rent for any period less than a month shall be prorated. In addition to the rent specified in the Schedule, Dealer (a) shall pay or reimburse Shell for, in accordance with law, all taxes applicable to the rental, possession or use of the Equipment and (b) shall bear the responsibility for and cost of installing and operating a dedicated business telephone line for the sole use of any EPOS dial terminal leased hereunder. Shell may adjust the monthly rent for any item of Equipment effective on the first of any month on giving Dealer at least 60 days' notice.

2. TERM. This Supplement shall remain in effect for the duration of the Agreement, but may be terminated by Shell or Dealer effective at the end of any month on giving the other at least 20 days' advance notice. If, prior to three years after the original installation of any unit of EPOS Equipment at the Station, this Supplement is terminated due to any act or default of Dealer hereunder or under the Agreement, Dealer will compensate Shell for Shell's original cost of installing such unit of Equipment (not to exceed $1,000), plus Shell's cost for removal of such unit of Equipment (not to exceed $1,000), unless the Equipment remains installed at the Station for continued use.

3. MAINTENANCE—RESPONSIBILITY. Shell will be responsible for prompt maintenance and repairs to the Equipment made necessary by normal wear and tear. Dealer shall be responsible for any maintenance and repairs, or loss, destruction or damage, which has resulted partly or solely from negligence or abuse of Dealer, or Dealer's employees, agents or contractors, from Dealer's failure to give prompt notice of the need for maintenance or repairs, or from any other cause whatever except for normal wear and tear for which Shell is responsible under the preceding sentence. Dealer shall be responsible for paper and ribbon replacement and daily cleaning of magnetic stripe readers of each unit of EPOS Equipment in accordance with Shell's instructions. Dealer shall maintain adequate insurance covering Dealer's responsibility for loss, destruction or damage as provided above and shall, upon request of Shell at any time, provide evidence that such insurance is in effect. Shell may, at its option, replace any unit of Equipment requiring service or which is considered inadequate by Shell with another new or reconditioned unit of equal capability. SHELL SHALL NOT BE RESPONSIBLE FOR ANY LOSS OF CURRENCY OR PROFITS RESULTING FROM TAMPERING OR MALFUNCTIONING OF THE EQUIPMENT.

4. REMEDIES—SURRENDER. Upon Dealer's default hereunder, Shell may, without limitation of any other rights or remedies available to it for such default, terminate this Supplement immediately upon notice to Dealer. Upon termination of this Supplement for whatever cause, Dealer shall immediately surrender possession of all the Equipment to Shell in its original condition, ordinary wear and tear excepted, and Shell shall have the right to enter the Station premises where the Equipment is located and to repossess and remove the same. Shell shall have no obligation to restore any damage to Dealer's facilities or premises reasonably required for removal of any EPOS Equipment.

5. NO WARRANTIES. SHELL EXPRESSLY DISCLAIMS ANY WARRANTIES, EXPRESS OR IMPLIED, WITH RESPECT TO THE EQUIPMENT, INCLUDING, WITHOUT LIMITATION, ANY IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE. Furthermore, Shell shall in no event be liable for any special, indirect, incidental or consequential damages of any nature.

6. NOTICES. Notices under this Supplement shall be given as provided in the Agreement.



Southeast Florida Retail District
Hillsboro Center
600 West Hillsboro Blvd., Suite 250
Deerfield Beach, FL 33441

Station Location: 20642 SR 7
BOCA RATON, FL 33434
Dealer WIC # 20908550724

April 27, 1994

PERSONAL DELIVERY

PASQUALE PERROTTA
d/b/a SHADOWWOOD PLAZA SHELL
3163 NE 8TH AVE.
BOCA RATON, FL 33434

Re: TEMPERATURE ADJUSTMENT OF MOTOR FUEL SALES UNDER DEALER AGREEMENT EFFECTIVE November 1, 1994

Dear Shell Dealer:

Reference is made to our proposed Dealer Agreement with you effective as above ("Agreement") covering Shell's sale and delivery to you of automotive gasoline (and automotive diesel fuel, if applicable) at the above station location.

This letter is to offer you the election of purchasing and being invoiced for all motor fuel delivered by Shell to you under the Agreement either on a volumetric basis or on a temperature adjusted basis to 60• F. Your election must be made by checking the appropriate block and by signing and dating both copies in the space provided below and returning one executed copy to us along with the Agreement executed by you.

Your election indicated below will be deemed to apply during the entire term of the Agreement, but your election and Shell's measurement of motor fuel sold and delivered to you will at all times be subject to modification in accordance with applicable statutory or other governmental requirements pertaining to motor fuel measurement.

Very truly yours,

J. M. PELLINO
AREA/TERRITORY MANAGER

SUBJECT TO THE FOREGOING, DEALER HEREBY ELECTS:

/___/ Volumetric measurement

/_X_/ Measurement temperature-adjusted to 60• F

PASQUALE PERROTTA,
d/b/a SHADOWWOOD PLAZA SHELL

P. Perrotta
______________________

Date: 6-9-94

MKT103.0/0887
19940427



**Shell Oil Products Company**

Hillsboro Center

800 West Hillsboro Blvd Suite 250
Deerfield Beach FL 33441

Southeast Florida Retail District

November 26, 1996

PERSONAL DELIVERY and CERTIFIED MAIL
RETURN RECEIPT REQUESTED

Mr. Pasquale Perrotta
20642 State Road 7
Boca Raton, Florida 33434

Re: Notice of Termination
Motor Fuel Station Lease
and Dealer Agreement
Both Dated: November 1, 1994
Station Location: 20642 State Road 7
Boca Raton, Florida 33434

Dear Mr. Perrotta:

Please refer to the Motor Fuel Station Lease ("Lease") effective November 1, 1994 between you and the Shell Oil Company ("Shell") covering the station located at 20642 State Road 7, Boca Raton, Florida 33434 ("Premises") and Dealer Agreement ("Agreement") of the same date between you and Shell covering the sale and delivery by Shell of Shell products to you at said Premises. Additionally, please refer to our letters to your attorney, Steven Utrecht, Esq., dated September 26, October 10, and October 17, 1996.

This letter is formal notice to you that Shell intends to terminate the Lease and Agreement effective March 6, 1997 on which date both instruments and the relationship thereunder will end. The reasons for such termination are:

(1) Your failure to comply with provisions of the franchise which are both reasonable and of material significance to the franchise relationship;

(2) Your failure to exert good faith efforts to carry out the provisions of the franchise and which failure is a ground for which termination of your franchise is permitted under the Petroleum Marketing Practices Act (P.M.P.A.), 15 U.S.C. § 2802(b)(2)(B). Additionally, Articles 10.1(b) of the Lease and 18.1(b) of the Agreement provide that your failure to exert good faith efforts to carry out the provisions of your franchise constitutes grounds for termination;

(3) The occurence of an event relevant to the franchise relationship and as a result of which termination of the franchise is reasonable; and specifically,

(4) Your failure to comply with laws relevant to the operation of the Premises, and which failure is a ground for which termination of your franchise is permitted under the Petroleum Marketing Practices Act (P.M.P.A.), 15 U.S.C. § 2802(c)(11). Additionally, Articles 10.1(c)(9) of the Lease and 18.1(c)(10) of Agreement provide that your failure to comply with local laws relevant to the operation of the Premises constitutes grounds for termination.

The facts giving rise to this termination notice are as follows:

You have recently erected a hand wash and wax facility at the Premises in order to conduct car wash operations. You did not seek Shell's prior approval, as required under Article 5.6 of your Lease. Nor did you secure any required permits to operate the car wash facility or to discharge wastewater generated from such operations. This is not the first time that you have done this. In early 1995 when you committed the same violation, the Palm Beach County Codes Enforcement Board issued a violation notice to Shell's landlord, which in turn sent Shell a lease violation letter. Shell informed you that your actions violated applicable laws as well as Shell's underlying lease, and you removed the facility before any action was taken to damage Shell's leasehold rights.

After you again committed this franchise violation, Shell sent three separate letters to your attorney to secure your removal of this hand wash facility. The October 17, 1996 letter required complete removal within ten (10) days, which you failed to do. In fact, you have only removed a crudely made, spray-painted sign which you had affixed to the kiosk building at the Premises in violation of Aritcle 11.1(i) of your Agreement. The hand wash facility remains in place as of the date of this notice.

Article 5.4 of the Lease and Article 6 of the Agreement require you to comply with all laws relating to the Premises. You have failed to comply with Palm Beach County Ordinance 92-90 relating to zoning of properties in the county. Your failure to exert good faith efforts to comply with the the provisions of the franchise is evidenced by the fact that you previously committed the same violations, and Shell warned you of the consequences of your failure to comply, but has been met with continued resistance and refusal to comply.

Accordingly, the Lease and Agreement and the franchise relationship thereunder will end not later than the above termination date. A Shell representative will be in contact with you prior to such date to arrange for your surrender of the Premises on or before such effective date of termination. However, you must immediately remove the hand wash facility, and Shell reserves all rights to take any and all actions necessary to secure its removal.

Enclosed is a Summary Statement of Title I of the Petroleum Marketing Practices Act, as prepared by the Department of Energy and published in the June 25, 1996 issue of the Federal Register (61 F.R. pp. 32786-32790).

You are requested to acknowledge receipt of this notice and of the Summary Statement by dating and signing both copies of this letter in the space provided below, and returning one copy to us in the enclosed return envelope.

Very truly yours,

R. F. Gardner, District Manager
Southeast Florida Retail Sales District

Attached - Revised Summary of Title I of the Petroleum Marketing Practices Act

RECEIPT HEREOF WITH SUMMARY STATEMENT
IS ACKNOWLEDGED AT__________(am) (pm)
THIS ______ DAY OF________________, 199__

______________________________
Dealer/Lessee

cc: Via Facsimile (561) 367-9045

Steven T. Utrecht, Esq.
Sanctuary Centre - Suite 300D
4800 North Federal Highway
Boca Raton, FL 33431

bc: B. L. Marks - Area Attorney East

J:\SPT204\WORD\LF831801.doc

## Revised Summary of Title I of the Petroleum Marketing Practices Act

AGENCY: Department of Energy.

ACTION: Notice.

SUMMARY: This notice contains a summary of Title I of the Petroleum Marketing Practices Act, as amended (the Act). The Petroleum Marketing Practices Act was originally enacted on June 19, 1978, and was amended by the Petroleum Marketing Practices Act Amendments of 1994, enacted on October 19, 1994. On August 30, 1978, the Department of Energy published in the Federal Register a summary of the provisions of Title I of the 1978 law, as required by the Act. The Department is publishing this revised summary to reflect key changes made by the 1994 amendments.

The Act is intended to protect franchised distributors and retailers of gasoline and diesel motor fuel against arbitrary or discriminatory termination or nonrenewal of franchises. This summary describes the reasons for which a franchise may be terminated or not renewed under the law, the responsibilities of franchisors, and the remedies and relief available to franchisees. The Act requires franchisors to give franchisees copies of the summary contained in this notice whenever notification of termination or nonrenewal of a franchise is given.

FOR FURTHER INFORMATION CONTACT: Carmen Difiglio, Office of Energy Efficiency, Alternative Fuels, and Oil Analysis (PO-62), U.S. Department of Energy, Washington, D.C. 20585, Telephone (202) 586-4444; Lawrence Leiken, Office of General Counsel (GC-73), U.S. Department of Energy, Washington, D.C. 20585, Telephone (202) 586-6978.

SUPPLEMENTARY INFORMATION: Title I of the Petroleum Marketing Practices Act, as amended, 15 U.S.C. §§ 2801–2806, provides for the protection of franchised distributors and retailers of motor fuel by establishing minimum Federal standards governing the termination of franchises and the nonrenewal of franchise relationships by the franchisor or distributor of such fuel.

Section 104(d)(1) of the Act required the Secretary of Energy to publish in the Federal Register a simple and concise summary of the provisions of Title I, including a statement of the respective

responsibilities of, and the remedies and relief available to, franchisors and franchisees under that title. The Department published this summary in the Federal Register on August 30, 1978. 43 F.R. 38743 (1978).

In 1994 the Congress enacted the Petroleum Marketing Practices Act Amendments to affirm and clarify certain key provisions of the 1978 statute. Among the key issues addressed in the 1994 amendments are: (1) termination or nonrenewal of franchised dealers by their franchisors for purposes of conversion to "company" operation; (2) application of state law; (3) the rights and obligations of franchisors and franchisees in third-party lease situations; and (4) waiver of rights limitations. *See* H.R. REP. NO. 737, 103rd Cong., 2nd Sess. 2 (1994), *reprinted in* 1994 U.S.C.C.A.N. 2780. Congress intended to: (1) make explicit that upon renewal a franchisor may not insist on changes to a franchise agreement where the purpose of such changes is to prevent renewal in order to convert a franchisee-operated service station into a company-operated service station; (2) make clear that where the franchisor has an option to continue the lease or to purchase the premises but does not wish to do so, the franchisor must offer to assign the option to the franchisee; (3) make clear that no franchisor may require, as a condition of entering or renewing a franchise agreement, that a franchisee waive any rights under the Petroleum Marketing Practices Act, any other Federal law, or any state law; and (4) reconfirm the limited scope of Federal preemption under the Act. *Id.*

The summary which follows reflects key changes to the statute resulting from the 1994 amendments. The Act requires franchisors to give copies of this summary statement to their franchisees when entering into an agreement to terminate the franchise or not to renew the franchise relationship, and when giving notification of termination or nonrenewal. This summary does not purport to interpret the Act, as amended, or to create new legal rights.

In addition to the summary of the provisions of Title I, a more detailed description of the definitions contained in the Act and of the legal remedies available to franchisees is also included in this notice, following the summary statement.

## Summary of Legal Rights of Motor Fuel Franchisees

This is a summary of the franchise protection provisions of the Federal Petroleum Marketing Practices Act, as amended in 1994 (the Act), 15 U.S.C. §§ 2801–2806. This summary must be given to you, as a person holding a franchise for the sale, consignment or distribution of gasoline or diesel motor fuel, in connection with any termination or nonrenewal of your franchise by your franchising company (referred to in this summary as your supplier).

You should read this summary carefully, and refer to the Act if necessary, to determine whether a proposed termination or nonrenewal of your franchise is lawful, and what legal remedies are available to you if you think the proposed termination or failure to renew is not lawful. In addition, if you think your supplier has failed to comply with the Act, you may wish to consult an attorney in order to enforce your legal rights.

The franchise protection provisions of the Act apply to a variety of franchise agreements. The term "franchise" is broadly defined as a license to use a motor fuel trademark which is owned or controlled by a refiner, and it includes secondary arrangements such as leases of real property and motor fuel supply agreements which have existed continuously since May 15, 1973, regardless of a subsequent withdrawal of a trademark. Thus, if you have lost the use of a trademark previously granted by your supplier but have continued to receive motor fuel supplies through a continuation of a supply agreement with your supplier, you are protected under the Act.

Any issue arising under your franchise which is not governed by this Act will be governed by the law of the State in which the principal place of business of your franchise is located.

Although a State may specify the terms and conditions under which your franchise may be transferred upon the death of the franchisee, it may not require a payment to you (the franchisee) for the goodwill of a franchise upon termination or nonrenewal.

The Act is intended to protect you, whether you are a distributor or a retailer, from arbitrary or discriminatory termination or nonrenewal of your franchise agreement. To accomplish this, the Act first lists the reasons for which termination or nonrenewal is permitted. Any notice of termination or nonrenewal must state the precise reason, as listed in the Act, for which the particular termination or nonrenewal is being made. These reasons are described below under the headings "Reasons for Termination" and "Reasons for Nonrenewal."

The Act also requires your supplier to give you a written notice of termination or intention not to renew the franchise within certain time periods. These requirements are summarized below under the heading "Notice Requirements for Termination or Nonrenewal."

The Act also provides certain special requirements with regard to trial and interim franchise agreements, which are described below under the heading "Trial and Interim Franchises."

The Act gives you certain legal rights if your supplier terminates or does not renew your franchise in a way that is not permitted by the Act. These legal rights are described below under the heading "Your Legal Rights."

The Act contains provisions pertaining to waiver of franchisee rights and applicable State law. These provisions are described under the heading "Waiver of Rights and Applicable State Law."

This summary is intended as a simple and concise description of the general nature of your rights under the Act. For a more detailed description of these rights, you should read the text of the Petroleum Marketing Practices Act, as amended in 1994 (15 U.S.C. §§ 2801–2806). This summary does not purport to interpret the Act, as amended, or to create new legal rights.

### I. Reasons for Termination

If your franchise was entered into on or after June 19, 1978, the Act bars termination of your franchise for any reasons other than those reasons discussed below. If your franchise was entered into before June 19, 1978, there is no statutory restriction on the reasons for which it may be terminated. If a franchise entered into before June 19, 1978, is terminated, however, the Act requires the supplier to reinstate the franchise relationship unless one of the reasons listed under this heading or one of the additional reasons for nonrenewal described below under the heading "Reasons for Nonrenewal" exists.

#### *A. Non-Compliance with Franchise Agreement*

Your supplier may terminate your franchise if you do not comply with a reasonable and important requirement of the franchise relationship. However, termination may not be based on a failure to comply with a provision of the franchise that is illegal or unenforceable under applicable Federal, State or local law. In order to terminate for non-compliance with the franchise agreement, your supplier must have learned of this non-compliance recently. The Act limits the time period within which your supplier must have learned of your non-compliance to various periods, the longest of which is 120

days, before you receive notification of the termination.

### B. Lack of Good Faith Efforts

Your supplier may terminate your franchise if you have not made good faith efforts to carry out the requirements of the franchise, provided you are first notified in writing that you are not meeting a requirement of the franchise and you are given an opportunity to make a good faith effort to carry out the requirement. This reason can be used by your supplier only if you fail to make good faith efforts to carry out the requirements of the franchise within the period which began not more than 180 days before you receive the notice of termination.

### C. Mutual Agreement To Terminate the Franchise

A franchise can be terminated by an agreement in writing between you and your supplier if the agreement is entered into not more than 180 days before the effective date of the termination and you receive a copy of that agreement, together with this summary statement of your rights under the Act. You may cancel the agreement to terminate within 7 days after you receive a copy of the agreement, by mailing (by certified mail) a written statement to this effect to your supplier.

### D. Withdrawal From the Market Area

Under certain conditions, the Act permits your supplier to terminate your franchise if your supplier is withdrawing from marketing activities in the entire geographic area in which you operate. You should read the Act for a more detailed description of the conditions under which market withdrawal terminations are permitted. *See* 15 U.S.C. § 2802(b)(E).

### E. Other Events Permitting a Termination

If your supplier learns within the time period specified in the Act (which in no case is more than 120 days prior to the termination notice) that one of the following events has occurred, your supplier may terminate your franchise agreement:

(1) Fraud or criminal misconduct by you that relates to the operation of your marketing premises.

(2) You declare bankruptcy or a court determines that you are insolvent.

(3) You have a severe physical or mental disability lasting at least 3 months which makes you unable to provide for the continued proper operation of the marketing premises.

(4) Expiration of your supplier's underlying lease to the leased marketing premises, if: (a) your supplier gave you written notice before the beginning of the term of the franchise of the duration of the underlying lease and that the underlying lease might expire and not be renewed during the term of the franchise; (b) your franchisor offered to assign to you, during the 90-day period after notification of termination or nonrenewal was given, any option which the franchisor held to extend the underlying lease or to purchase the marketing premises (such an assignment may be conditioned on the franchisor receiving from both the landowner and the franchisee an unconditional release from liability for specified events occurring after the assignment); and (c) in a situation in which the franchisee acquires possession of the leased marketing premises effective immediately after the loss of the right of the franchisor to grant possession, the franchisor, upon the written request of the franchisee, made a bona fide offer to sell or assign to the franchisee the franchisor's interest in any improvements or equipment located on the premises, or offered the franchisee a right of first refusal of any offer from another person to purchase the franchisor's interest in the improvements and equipment.

(5) Condemnation or other taking by the government, in whole or in part, of the marketing premises pursuant to the power of eminent domain. If the termination is based on a condemnation or other taking, your supplier must give you a fair share of any compensation which he receives for any loss of business opportunity or good will.

(6) Loss of your supplier's right to grant the use of the trademark that is the subject of the franchise, unless the loss was because of bad faith actions by your supplier relating to trademark abuse, violation of Federal or State law, or other fault or negligence.

(7) Destruction (other than by your supplier) of all or a substantial part of your marketing premises. If the termination is based on the destruction of the marketing premises and if the premises are rebuilt or replaced by your supplier and operated under a franchise, your supplier must give you a right of first refusal to this new franchise.

(8) Your failure to make payments to your supplier of any sums to which your supplier is legally entitled.

(9) Your failure to operate the marketing premises for 7 consecutive days, or any shorter period of time which, taking into account facts and circumstances, amounts to an unreasonable period of time not to operate.

(10) Your intentional adulteration, mislabeling or misbranding of motor fuels or other trademark violations.

(11) Your failure to comply with Federal, State, or local laws or regulations of which you have knowledge and that relate to the operation of the marketing premises.

(12) Your conviction of any felony involving moral turpitude.

(13) Any event that affects the franchise relationship and as a result of which termination is reasonable.

## II. Reasons for Nonrenewal

If your supplier gives notice that he does not intend to renew any franchise agreement, the Act requires that the reason for nonrenewal must be either one of the reasons for termination listed immediately above, or one of the reasons for nonrenewal listed below.

### A. Failure To Agree on Changes or Additions To Franchise

If you and your supplier fail to agree to changes in the franchise that your supplier in good faith has determined are required, and your supplier's insistence on the changes is not for the purpose of converting the leased premises to a company operation or otherwise preventing the renewal of the franchise relationship, your supplier may decline to renew the franchise.

### B. Customer Complaints

If your supplier has received numerous customer complaints relating to the condition of your marketing premises or to the conduct of any of your employees, and you have failed to take prompt corrective action after having been notified of these complaints, your supplier may decline to renew the franchise.

### C. Unsafe or Unhealthful Operations

If you have failed repeatedly to operate your marketing premises in a clean, safe and healthful manner after repeated notices from your supplier, your supplier may decline to renew the franchise.

### D. Operation of Franchise is Uneconomical

Under certain conditions specified in the Act, your supplier may decline to renew your franchise if he has determined that renewal of the franchise is likely to be uneconomical. Your supplier may also decline to renew your franchise if he has decided to convert your marketing premises to a use other than for the sale of motor fuel, to sell the premises, or to materially alter, add to, or replace the premises.

3054286622 SE FLORIDA DISTRICT P.355 T-345 P.005 FEB 05 97 09:54



### III. Notice Requirements for Termination or Nonrenewal

The following is a description of the requirements for the notice which your supplier must give you before he may terminate your franchise or decline to renew your franchise relationship. These notice requirements apply to all franchise terminations, including franchises entered into before June 19, 1978 and trial and interim franchises, as well as to all nonrenewals of franchise relationships.

*A. How Much Notice Is Required*

In most cases, your supplier must give you notice of termination or non-renewal at least 90 days before the termination or nonrenewal takes effect.

In circumstances where it would not be reasonable for your supplier to give you 90 days notice, he must give you notice as soon as he can do so. In addition, if the franchise involves leased marketing premises, your supplier may not establish a new franchise relationship involving the same premises until 30 days after notice was given to you or the date the termination or nonrenewal takes effect, whichever is later. If the franchise agreement permits, your supplier may repossess the premises and, in reasonable circumstances, operate them through his employees or agents.

If the termination or nonrenewal is based upon a determination to withdraw from the marketing of motor fuel in the area, your supplier must give you notice at least 180 days before the termination or nonrenewal takes effect.

*B. Manner and Contents of Notice*

To be valid, the notice must be in writing and must be sent by certified mail or personally delivered to you. It must contain:

(1) A statement of your supplier's intention to terminate the franchise or not to renew the franchise relationship, together with his reasons for this action;

(2) The date the termination or non-renewal takes effect; and

(3) A copy of this summary.

### IV. Trial Franchises and Interim Franchises

The following is a description of the special requirements that apply to trial and interim franchises.

*A. Trial Franchises*

A trial franchise is a franchise, entered into on or after June 19, 1978, in which the franchisee has not previously been a party to a franchise with the franchisor and which has an initial term of 1 year or less. A trial franchise must be in writing and must make certain disclosures, including that it is a trial franchise, and that the franchisor has the right not to renew the franchise relationship at the end of the initial term by giving the franchisee proper notice.

The unexpired portion of a transferred franchise (other than as a trial franchise, as described above) does not qualify as a trial franchise.

In exercising his right not to renew a trial franchise at the end of its initial term, your supplier must comply with the notice requirements described above under the heading "Notice Requirements for Termination or Nonrenewal."

*B. Interim Franchises*

An interim franchise is a franchise, entered into on or after June 19, 1978, the duration of which, when combined with the terms of all prior interim franchises between the franchisor and the franchisee, does not exceed three years, and which begins immediately after the expiration of a prior franchise involving the same marketing premises which was not renewed, based on a lawful determination by the franchisor to withdraw from marketing activities in the geographic area in which the franchisee operates.

An interim franchise must be in writing and must make certain disclosures, including that it is an interim franchise and that the franchisor has the right not to renew the franchise at the end of the term based upon a lawful determination to withdraw from marketing activities in the geographic area in which the franchisee operates.

In exercising his right not to renew a franchise relationship under an interim franchise at the end of its term, your supplier must comply with the notice requirements described above under the heading "Notice Requirements for Termination or Nonrenewal."

### V. Your Legal Rights

Under the enforcement provisions of the Act, you have the right to sue your supplier if he fails to comply with the requirements of the Act. The courts are authorized to grant whatever equitable relief is necessary to remedy the effects of your supplier's failure to comply with the requirements of the Act, including declaratory judgment, mandatory or prohibitive injunctive relief, and interim equitable relief. Actual damages, exemplary (punitive) damages under certain circumstances, and reasonable attorney and expert witness fees are also authorized. For a more detailed description of these legal remedies you should read the text of the Act. 15 U.S.C. §§ 2801–2806.

### VI. Waiver of Rights and Applicable State Law

Your supplier may not require, as a condition of entering into or renewing the franchise relationship, that you relinquish or waive any right that you have under this or any other Federal law or applicable State law. In addition, no provision in a franchise agreement would be valid or enforceable if the provision specifies that the franchise would be governed by the law of any State other than the one in which the principal place of business for the franchise is located.

## Further Discussion of Title I—Definitions and Legal Remedies

### I. Definitions

Section 101 of the Petroleum Marketing Practices Act sets forth definitions of the key terms used throughout the franchise protection provisions of the Act. The definitions from the Act which are listed below are of those terms which are most essential for purposes of the summary statement. (You should consult section 101 of the Act for additional definitions not included here.)

*A. Franchise*

A "franchise" is any contract between a refiner and a distributor, between a refiner and a retailer, between a distributor and another distributor, or between a distributor and a retailer, under which a refiner or distributor (as the case may be) authorizes or permits a retailer or distributor to use, in connection with the sale, consignment, or distribution of motor fuel, a trademark which is owned or controlled by such refiner or by a refiner which supplies motor fuel to the distributor which authorizes or permits such use.

The term "franchise" includes any contract under which a retailer or distributor (as the case may be) is authorized or permitted to occupy leased marketing premises, which premises are to be employed in connection with the sale, consignment, or distribution of motor fuel under a trademark which is owned or controlled by such refiner or by a refiner which supplies motor fuel to the distributor which authorizes or permits such occupancy. The term also includes any contract pertaining to the supply of motor fuel which is to be sold, consigned or distributed under a trademark owned or controlled by a refiner, or under a contract which has existed continuously since May 15, 1973, and pursuant to which, on May 15, 1973, motor fuel was sold, consigned or distributed under a

trademark owned or controlled on such date by a refiner. The unexpired portion of a transferred franchise is also included in the definition of the term.

*B. Franchise Relationship*

The term "franchise relationship" refers to the respective motor fuel marketing or distribution obligations and responsibilities of a franchisor and a franchisee which result from the marketing of motor fuel under a franchise.

*C. Franchisee*

A "franchisee" is a retailer or distributor who is authorized or permitted, under a franchise, to use a trademark in connection with the sale, consignment, or distribution of motor fuel.

*D. Franchisor*

A "franchisor" is a refiner or distributor who authorizes or permits, under a franchise, a retailer or distributor to use a trademark in connection with the sale, consignment, or distribution of motor fuel.

*E. Marketing Premises*

"Marketing premises" are the premises which, under a franchise, are to be employed by the franchisee in connection with the sale, consignment, or distribution of motor fuel.

*F. Leased Marketing Premises*

"Leased marketing premises" are marketing premises owned, leased or in any way controlled by a franchisor and which the franchisee is authorized or permitted, under the franchise, to employ in connection with the sale, consignment, or distribution of motor fuel.

*G. Fail to Renew and Nonrenewal*

The terms "fail to renew" and "nonrenewal" refer to a failure to reinstate, continue, or extend a franchise relationship (1) at the conclusion of the term, or on the expiration date, stated in the relevant franchise, (2) at any time, in the case of the relevant franchise which does not state a term of duration or an expiration date, or (3) following a termination (on or after June 19, 1978) of the relevant franchise which was entered into prior to June 19, 1978 and has not been renewed after such date.

**II. Legal Remedies Available to Franchisee**

The following is a more detailed description of the remedies available to the franchisee if a franchise is terminated or not renewed in a way that fails to comply with the Act.

*A. Franchisee's Right to Sue*

A franchisee may bring a civil action in United States District Court against a franchisor who does not comply with the requirements of the Act. The action must be brought within one year after the date of termination or nonrenewal or the date the franchisor fails to comply with the requirements of the law, whichever is later.

*B. Equitable Relief*

Courts are authorized to grant whatever equitable relief is necessary to remedy the effects of a violation of the law's requirements. Courts are directed to grant a preliminary injunction if the franchisee shows that there are sufficiently serious questions, going to the merits of the case, to make them a fair ground for litigation, and if, on balance, the hardship which the franchisee would suffer if the preliminary injunction is not granted will be greater than the hardship which the franchisor would suffer if such relief is granted.

Courts are not required to order continuation or renewal of the franchise relationship if the action was brought after the expiration of the period during which the franchisee was on notice concerning the franchisor's intention to terminate or not renew the franchise agreement.

*C. Burden of Proof*

In an action under the Act, the franchisee has the burden of proving that the franchise was terminated or not renewed. The franchisor has the burden of proving, as an affirmative defense, that the termination or nonrenewal was permitted under the Act and, if applicable, that the franchisor complied with certain other requirements relating to terminations and nonrenewals based on condemnation or destruction of the marketing premises.

*D. Damages*

A franchisee who prevails in an action under the Act is entitled to actual damages and reasonable attorney and expert witness fees. If the action was based upon conduct of the franchisor which was in willful disregard of the Act's requirements or the franchisee's rights under the Act, exemplary (punitive) damages may be awarded where appropriate. The court, and not the jury, will decide whether to award exemplary damages and, if so, in what amount.

On the other hand, if the court finds that the franchisee's action is frivolous, it may order the franchisee to pay reasonable attorney and expert witness fees.

*E. Franchisor's Defense to Permanent Injunctive Relief*

Courts may not order a continuation or renewal of a franchise relationship if the franchisor shows that the basis of the non-renewal of the franchise relationship was a determination made in good faith and in the normal course of business:

(1) To convert the leased marketing premises to a use other than the sale or distribution of motor fuel;

(2) To materially alter, add to, or replace such premises;

(3) To sell such premises;

(4) To withdraw from marketing activities in the geographic area in which such premises are located; or

(5) That the renewal of the franchise relationship is likely to be uneconomical to the franchisor despite any reasonable changes or additions to the franchise provisions which may be acceptable to the franchisee.

In making this defense, the franchisor also must show that he has complied with the notice provisions of the Act.

This defense to permanent injunctive relief, however, does not affect the franchisee's right to recover actual damages and reasonable attorney and expert witness fees if the nonrenewal is otherwise prohibited under the Act.

Issued in Washington, D.C. on June 12, 1996.

Marc W. Chupka,

*Acting Assistant Secretary for Policy.*

[FR Doc. 96-16124 Filed 6-24-96; 8:45 am]

BILLING CODE 6450-01-P

JS 44
(Rev. 07/89)

# CIVIL COVER SHEET

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

**I (a) PLAINTIFFS**

SHELL OIL COMPANY,

**DEFENDANTS** 97-8074 CIV-HURLEY

PASQUALE PERROTTA,

MAGISTRATE JUDGE LYNCH

(b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF Broward
(EXCEPT IN U.S. PLAINTIFF CASES)

A PALM BEACH 97cv8074 DKHT FJL

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT ____
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED

FILED BY ____ D.C.
97 FEB -5 PM 2:42
CARLOS JUENKE
CLERK U.S. DIST. CT.
S.D. OF FLA. - W.P.B.

(c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

BRUCE HOFFMAN, ESQ., HOLLAND & KNIGHT
701 BRICKELL AVENUE, SUITE 3000
MIAMI, FL 33131 (305) 374-8500

ATTORNEYS (IF KNOWN)

(d) CIRCLE COUNTY WHERE ACTION AROSE:
DADE, MONROE, BROWARD, (PALM BEACH), MARTIN, ST. LUCIE, INDIAN RIVER, OKEECHOBEE, HIGHLANDS

## II. BASIS OF JURISDICTION (PLACE AN x IN ONE BOX ONLY)

- ☐ 1 U.S. Government Plaintiff
- ☒ 3 Federal Question (U.S. Government Not a Party)
- ☐ 2 U.S. Government Defendant
- ☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN x IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☐ 1 | Incorporated or Principal Place of Business in This State | 4 | 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☒ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. CAUSE OF ACTION (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE. DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY)

IVa. ______ days estimated (for both sides) to try entire case.

## V. NATURE OF SUIT (PLACE AN x IN ONE BOX ONLY)

**A CONTRACT**
- ☐ 110 Insurance
- ☐ 120 Marine
- ☐ 130 Miller Act
- ☐ 140 Negotiable Instrument
- ☐ 150 Recovery of Overpayment & Enforcement of Judgment
- ☐ 151 Medicare Act
- B ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans)
- B ☐ 153 Recovery of Overpayment of Veteran's Benefits
- ☐ 160 Stockholders' Suits
- ☒ 190 Other Contract
- ☐ 195 Contract Product Liability

**A REAL PROPERTY**
- ☐ 210 Land Condemnation
- B ☐ 220 Foreclosure
- ☐ 230 Rent Lease & Ejectment
- ☐ 240 Torts to Land
- ☐ 245 Tort Product Liability
- ☐ 290 All Other Real Property

**A TORTS**

PERSONAL INJURY
- ☐ 310 Airplane
- ☐ 315 Airplane Product Liability
- ☐ 320 Assault, Libel & Slander
- ☐ 330 Federal Employers' Liability
- ☐ 340 Marine
- ☐ 345 Marine Product Liability
- ☐ 350 Motor Vehicle
- ☐ 355 Motor Vehicle Product Liability
- ☐ 360 Other Personal Injury

PERSONAL INJURY
- ☐ 362 Personal Injury—Med Malpractice
- ☐ 365 Personal Injury—Product Liability
- ☐ 368 Asbestos Personal Injury Product Liability

PERSONAL PROPERTY
- ☐ 370 Other Fraud
- B ☐ 371 Truth in Lending
- ☐ 380 Other Personal Property Damage
- ☐ 385 Property Damage Product Liability

**A CIVIL RIGHTS**
- ☐ 441 Voting
- ☐ 442 Employment
- ☐ 443 Housing/Accommodations
- ☐ 444 Welfare
- ☐ 440 Other Civil Rights

**B PRISONER PETITIONS**
- ☐ 510 Motions to Vacate Sentence
- Habeas Corpus:
- * ☐ 530 General
- ☐ 535 Death Penalty
- * ☐ 540 Mandamus & Other
- ☐ 550 Civil Rights
- *A or B

**B FORFEITURE/PENALTY**
- ☐ 610 Agriculture
- ☐ 620 Other Food & Drug
- ☐ 625 Drug Related Seizure of Property 21 USC 881
- ☐ 630 Liquor Laws
- ☐ 640 R.R. & Truck
- ☐ 650 Airline Regs
- ☐ 660 Occupational Safety/Health
- ☐ 690 Other

**A LABOR**
- ☐ 710 Fair Labor Standards Act
- B ☐ 720 Labor/Mgmt. Relations
- ☐ 730 Labor/Mgmt. Reporting & Disclosure Act
- ☐ 740 Railway Labor Act
- ☐ 790 Other Labor Litigation
- B ☐ 791 Empl. Ret. Inc. Security Act

**A BANKRUPTCY**
- ☐ 422 Appeal 28 USC 158
- ☐ 423 Withdrawal 28 USC 157

**A PROPERTY RIGHTS**
- ☐ 820 Copyrights
- ☐ 830 Patent
- ☐ 840 Trademark

**B SOCIAL SECURITY**
- ☐ 861 HIA (1395ff)
- ☐ 862 Black Lung (923)
- ☐ 863 DIWC/DIWW (405(g))
- ☐ 864 SSID Title XVI
- ☐ 865 RSI (405(g))

**A FEDERAL TAX SUITS**
- ☐ 870 Taxes (U.S. Plaintiff or Defendant)
- ☐ 871 IRS—Third Party 26 USC 7609

**A OTHER STATUTES**
- ☐ 400 State Reapportionment
- ☐ 410 Antitrust
- ☐ 430 Banks and Banking
- B ☐ 450 Commerce/ICC Rates/etc.
- ☐ 460 Deportation
- ☐ 470 Racketeer Influenced and Corrupt Organizations
- ☐ 810 Selective Service
- ☐ 850 Securities/Commodities/Exchange
- ☐ 875 Customer Challenge 12 USC 3410
- ☐ 891 Agricultural Acts
- ☐ 892 Economic Stabilization Act
- ☐ 893 Environmental Matters
- ☐ 894 Energy Allocation Act
- ☐ 895 Freedom of Information Act
- ☐ 900 Appeal of Fee Determination Under Equal Access to Justice
- ☐ 950 Constitutionality of State Statutes
- * ☐ 890 Other Statutory Actions
- *A or B

## VI. ORIGIN (PLACE AN x IN ONE BOX ONLY)

- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Refiled
- ☐ 5 Transferred from another district (specify)
- ☐ 6 Multidistrict Litigation
- ☐ 7 Appeal to District Judge from Magistrate Judgment

## VII. REQUESTED IN COMPLAINT:

CHECK IF THIS IS A CLASS ACTION ☐ UNDER F.R.C.P. 23

DEMAND $

Check YES only if demanded in complaint:
JURY DEMAND: ☐ YES ☐ NO

## VIII. RELATED CASE(S) (See instructions): IF ANY

JUDGE ____ DOCKET NUMBER ____

DATE 2/5/1997

SIGNATURE OF ATTORNEY OF RECORD [signature]

UNITED STATES DISTRICT COURT
S/F I-2

FOR OFFICE USE ONLY: Receipt No. 677379 Amount: 150.00
Date Paid: 02/05/97 M/ifp: